## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AVON COMPANY f/k/a NEW AVON LLC and LG H&H CO., LTD. f/k/a LG HOUSEHOLD & HEALTH CARE, LTD., | Civil Action No. |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FAREVA MORTON GROVE, INC. and FAREVA S.A., | |
| Defendants. | |

Plaintiffs, The Avon Company f/k/a/ New Avon LLC and LG H&H Co., Ltd. f/k/a LG Household & Health Care, Ltd. ("LG H&H") (collectively, "Plaintiffs" or "Avon"), by their undersigned counsel, as and for their Complaint against Defendants Fareva Morton Grove, Inc. and Fareva S.A. (collectively, "Defendants" or "Fareva") allege as follows:

### NATURE OF THE ACTION

1.      Avon brings this action against Fareva for a preliminary and permanent injunction and damages caused by Fareva's breach of a Manufacturing & Supply Agreement by and among Fareva Morton Grove, Inc. (as Supplier), Fareva S.A. (as Guarantor), and New Avon LLC (as Purchaser), (the "MSA"), dated December 1, 2018.  New Avon LLC assigned the MSA in September 2020 to its corporate parent, LG H&H, although it remained a third-party beneficiary to the agreement.

2.      In relevant part, the terms of the MSA required Fareva to (i) manufacture and supply Avon's requirements of Products for a ten (10) year period, which could be extended for at least an additional five years; (ii) cease allocating capacity to other Persons unless and until one

hundred percent (100%) of Avon's orders are being consistently fulfilled; and (iii) provide Transition Support services for a minimum of six months in the event that the MSA was terminated "for any reason." The MSA defines Transition Support to include Fareva's use of "commercially reasonable efforts, to transition responsibility for manufacturing and supplying the Products from" Fareva to another manufacturer, "as quickly and efficiently as possible with minimal disruption to [Avon's] business or the quality or availability of Products." In addition, the MSA provides that "[d]uring the Transition Period, [Fareva] shall continue to manufacture and supply Products, as directed by [Avon], in accordance with the terms of this Agreement."

3.      Fareva manufactures and supplies many of Avon's most popular beauty Products. By letter dated March 29, 2022, Fareva notified Avon that Fareva intended to terminate the MSA, and thirty days following its notice, Fareva would cease supplying Products to Avon. Fareva has, in fact, since ceased producing Products that Fareva is required to supply Avon under the MSA.

4.      As a result of Fareva's actions, which are on-going, Avon will have few beauty Products to sell and it will suffer damages and irreparable harm, including, but not limited to, the loss of business, loss of reputation and goodwill, and other damages for which there is no adequate remedy at law.

5.      An injunction against any further prohibited activities is necessary to prevent further harm to Avon caused by Fareva's illegal activity, which if it continues unabated, will result in Avon losing business, customers, and goodwill.

6.      Avon also seeks contractual fees that Fareva is required to pay as a result of (i) Fareva's failure to deliver Products to Avon in breach of the MSA's plain terms, and (ii) its termination of the MSA.

## THE PARTIES

7.      Plaintiff The Avon Company f/k/a/ New Avon LLC is a corporation organized under the laws of the State of Wyoming with its principal place of business in New York.

8.      Plaintiff LG H&H Co., Ltd. f/k/a LG Household & Health Care, Ltd. is a Korean company with its principal place of business in Seoul, Korea.

9.      Upon information and belief, Defendant Fareva Morton, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Illinois.

10.      Upon information and belief, Defendant Fareva S.A.. is a French company with its principal place of business in Thomas Angers, France.

## JURISDICTION, VENUE AND GOVERNING LAW

11.      This Court has jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  The amount in controversy, exclusive of interest and costs, is in excess of $75,000.

12.      Pursuant to Paragraph 14.2 of the MSA, the laws of the State of New York "shall govern all questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement."

13.      The Court has personal jurisdiction over Fareva at least because Fareva consented to jurisdiction in this Court pursuant to Paragraph 14.3 of the MSA.

14.      Venue and Jurisdiction are proper in this district under 28 U.S.C. § 1391(a), (b), and (c) because Fareva, by direct agreement, and/or by operation of law, has consented to such jurisdiction pursuant to Paragraph 14.3 of the MSA.

4876-2900-3551v.9

## FACTS

### A.   Background of Avon

15.    Avon is a leading beauty company that develops and commercializes quality beauty products in North America.  Avon offers a variety of different products in the North American market that fall into two general categories: (i) beauty, and (ii) fashion and home.  Avon's beauty products include, among other things, a wide range of makeup, fragrances, skin care, hair care and oral care products.  Avon's fashion and home products include jewelry, garments, footwear, accessories, dish wear and candles.

16.    Avon's products are marketed primarily by Independent Sales Representatives who sell Avon's goods to friends, family, and neighbors within their network and communities.

17.    The direct selling market for beauty, cosmetics and home products is large and highly competitive.  Avon relies on the relationships and goodwill that its Independent Sales Representatives develop with customers to sell Avon's product offerings.

### B.   Avon's Relationship with Fareva Under the MSA

18.    Prior to 2018, New Avon LLC and/or its predecessor company, non-party Avon Products Inc., owned several manufacturing sites in North America, including, *inter alia*, in Morton Grove, Illinois.

19.    Over the years, New Avon LLC sold its manufacturing sites in Canada, New York and Ohio.  By 2012, New Avon LLC had consolidated all of its North American manufacturing to the Morton Grove facility.  Since 2012, the vast majority of Avon's products have been exclusively manufactured at Morton Grove.

20.    On or about December 1, 2018, New Avon LLC sold the Morton Grove facility to Fareva pursuant to an Asset Purchase Agreement.  That same day, the parties also executed the

4

MSA, under which Fareva agreed to manufacture, test and supply virtually all of Avon's beauty Products for a 10-year period, which could be extended for at least an additional five years.

21.     Because consistent product availability is a critical factor to Avon's business, the company's executives were initially hesitant to sell the Morton Grove facility.  They were concerned about potentially disrupting Avon's ability to quickly source products to be sold by Avon's representatives throughout North America.

22.     In exchange for Fareva's long term agreement to manufacture Avon's Products at a discounted rate, Avon sold the Morton Grove facility to Fareva for tens of millions of dollars below the value of the facility.

23.     In the MSA, Fareva agreed to abide by specific obligations concerning the Products' costs, quality, and services.  For example, Fareva agreed to a fixed rate for the price per unit (*i.e.*, conversion rate) with respect to each Product for the first five years of the MSA.  Fareva also agreed that it would be obligated to accept and fulfill each Order that Avon placed for Products so long as the number of product units did not exceed the specified Projected Ceiling under the MSA.  Additionally, Fareva agreed that each Product had to pass a quality control process in accordance with the MSA's specifications before the Product was shipped to Avon's distribution center.

24.     By virtue of the transaction described above, Fareva would, as a practical matter, be Avon's exclusive supplier for a significant portion of Avon's Products; because of this, Fareva agreed to minimize supply disruptions to product availability.  For example, pursuant to Section 3.5, Fareva agreed that in the event it failed, or was otherwise unable to deliver any Products to Avon in accordance with the MSA's requirements, Fareva would not "allocate any capacity to other Persons unless and until one hundred percent (100%) of [Avon's] Orders are being

consistently fulfilled."  In addition, under Section 9.2, in the event that the MSA was terminated by either party "for any reason," Fareva was still responsible for providing "Transition Support" services to Avon for up to six months (the "Transition Period").

25.     The MSA defines Transition Support to include Fareva's use of "commercially reasonable efforts, to transition responsibility for manufacturing and supplying the Products from" Fareva to another manufacturer, "as quickly and efficiently as possible with minimal disruption to [Avon's] business or the quality or availability of Products.  In addition, the MSA provides that "[d]uring the Transition Period, [Fareva] shall continue to manufacture and supply Products, as directed by [Avon], in accordance with the terms of this Agreement."

26.     On September 1, 2020, The Avon Company, then known as New Avon Company (f/k/a/ New Avon LLC) assigned the MSA to LG H&H.  Pursuant to Section 14.1 of the MSA, because the MSA was intended to benefit The Avon Company, The Avon Company remained "responsible and liable for the performance by [LG H&H] of its obligations" under the MSA. Additionally, The Avon Company retained the right to purchase Products from Fareva pursuant to the MSA's terms.  It is therefore a third-party beneficiary to the MSA, and may enforce its rights under the MSA in that capacity.

**C.     Fareva Incorrectly Purports to Terminate the MSA Under Section 13.3(c)(i)**

27.     The MSA may be terminated by Fareva in only two specific circumstances.  First, Section 13.3(c)(i) of the MSA permits Fareva to terminate upon 30-days written notice if Avon "fails to pay a material undisputed amount" owed to Fareva, "within sixty (60) days after receipt of written notice."

28.     Second, Fareva may terminate the MSA for "convenience" under Section 13.3(c)(ii), so long as Fareva (i) provides a two-year written early termination notice to Avon; (ii)

has not materially breached the MSA as of the date of the early termination notice (or during the time period between the date of the early termination notice and the effective date of termination); and (iii) has paid an Early Termination Fee, as set forth in Section 13.3(d) of the MSA. The Early Termination Fee requires a payment of $4,000,000 "for each full or partial Contract Year" remaining under the 10-year initial term of the MSA. The parties negotiated this specific termination fee to ensure that Fareva would not receive a windfall if it terminated the agreement prior to the expiration of its 10-year term and after acquiring the Morton Grove facility at the heavily discounted purchase price for which it was allowed to purchase the facility.

29.     In an effort to circumvent the Early Termination Fee, by letter dated March 29, 2022, Fareva claimed that it was terminating the MSA pursuant to Section 13.3(c)(i) because it had issued a $621,000 invoice on November 12, 2021 and, according to Fareva, the invoice was "undisputed" by Avon, and remained "unpaid."

30.     Avon did, however, dispute the November 12, 2021 invoice because it not only overstated the amount actually owed, but it was also subject to offset against amounts that Fareva owed Avon pursuant to the MSA's terms. Fareva knew of the dispute, as the parties had numerous communications on the issue of what offsets were due and thus what undisputed amounts were actually owed Fareva.

31.     Notwithstanding the on-going dispute over this and other invoices as well as other issues related to the reconciliation of outstanding amounts Fareva owed Avon, Avon paid Fareva the $621,000 demanded in the invoice, in full on March 30, 2022 and thereby cured any alleged breach (which did not exist in any event). By letter dated March 30, 2022, Avon notified Fareva that it had paid the $621,000 invoice, but that it did not concede that amount was owed or the merits of Fareva's position.

32.     Although Avon cured the alleged breach, by letter dated April 5, 2022, Fareva informed Avon that it would "maintain [the] termination."

33.     Two days later, in an April 7, 2022 letter, Avon advised Fareva that the conditions for Fareva to terminate the MSA under Section 13.1(c) had not been satisfied because the $621,000 invoice was not a material undisputed amount, and in any event, Avon had paid the invoice to "cure the situation in good faith, and to continue discussions on ongoing disputes."  Avon also told Fareva that it considered the MSA to still be "effective, and that both parties should comply with its terms and conditions."

34.     The following week, during an in-person meeting with Fareva executives on April 14, 2022, Avon informed Fareva that it would "respect Fareva's decision to terminate" the MSA, even though Fareva had failed to satisfy the conditions for termination under Section 13.3(c)(i). The parties also agreed that the MSA required Fareva to act professionally and in good faith to transition manufacturing of Avon's Products to an LG H&H facility in Guangzhou, China as quickly and efficiently as reasonably possible and with minimal disruption to Avon's business.

35.     Avon also notified Fareva that because the $621,000 referenced in Fareva's November 12, 2021 invoice did not reflect a "material undisputed amount," Fareva's termination was not authorized by Section 13.3(c)(i), and must be deemed to be a termination "for convenience."

36.     No matter whether the termination occurred under Section 13.3(c)(i) or (ii), Section 9.2 of the MSA unequivocally requires Fareva to provide Transition Support services for at least six months following a termination, including by continuing to supply Products to Avon during the Transition Period.

37.     The MSA makes clear that Fareva is not authorized to place any conditions on Avon in exchange for Fareva's obligation to provide Transition Support services.  Indeed, Section 9.2 of the MSA provides that "[d]uring the Transition Period, [Fareva] *shall continue* to manufacture and supply Products as directed by [Avon], in accordance with the terms of this Agreement," and that "[in] the case of a termination … *for any reason*, the term of this Agreement shall automatically extend for the full duration of the Transition Period."

38.     Fareva has willfully refused to abide by Section 9.2 of the MSA.  Instead it has conditioned its already existing contractual obligation to continue supplying Products to Avon, upon Avon's agreement to a number of conditions that are found nowhere in the MSA.

39.      For example, by letter dated April 27, 2022, Fareva advised that it would not "further supply Products" to Avon after the MSA terminated, unless Avon agreed, among other things, to (i) immediately pay all allegedly overdue invoices that Fareva had issued, regardless of whether Avon disputed those invoices; (ii) pay all other invoices that had already been issued within 45 days, regardless of whether Avon disputed those invoices; (iii) pay any new invoices within seven days of receipt for business done in April 2022, notwithstanding that the MSA does not provide for a seven-day payment window but instead calls for a 45-day payment terms (which begins only if the payment is undisputed); (iv) pre-pay for any new orders, despite the fact that the MSA does not require prepayment; (v) accept a price increase of 4 cents per unit, even though the MSA does not contemplate any such increase; (vi) not cancel any placed orders without agreement from Fareva, even though the MSA permits Avon to cancel orders under certain circumstances; and (vii) bear the entire cost of the Transition Support services, even though the MSA does not require Avon to do so.

9

40.     Even though it had no obligation to do so, and in an effort to accommodate Fareva and address Fareva's unsupported claim that it was suffering financial difficulties, Avon agreed to certain demands made by Fareva. These demands included (i) paying undisputed current invoices, (ii) not cancelling placed orders without Fareva's consent, (iii) prepayment of new orders, and (iv) increased pricing of 4 cents per unit.

41.     Fareva, however, still willfully refused to manufacture the Products it is required to supply Avon during the Transition Period, and demanded that Avon execute a settlement agreement that would require Avon to waive any claims that it had against Fareva.  In other words, Fareva took the position that it will satisfy its contractual obligations under the MSA to provide critical Transition Support and continue to produce Products which were essential for Avon's ongoing business operations, only if Avon agreed that it would never sue Fareva for any of its past breaches of the MSA.  This agreement included foregoing legal recourse with respect to any of the improper charges that Fareva purported to impose on Avon and which Avon was forced to pay to ensure that Fareva would perform its already existing obligations.

**D.      Fareva Ceased Production on May 5, 2022 in Violation of the MSA**

42.     In further communications subsequent to its demand that Avon enter into a settlement agreement, Fareva was unclear about whether it still sought Avon's execution of the settlement agreement as a condition to Fareva's performance.  But, in those communications, Fareva was clear in its continued demand that Avon pay certain invoices, totaling approximately $21 million, before it would fully resume the production of Products to cover the Transition Period of up to 6 months.  Of those invoices, Fareva conceded that some of these invoices were not even due until June 12, 2022.  Moreover, Fareva has not even provided proper documentation to allow Avon to confirm that all the invoices are accurate.  Avon was willing to pay certain Fareva invoices

as they became due if Fareva could provide documentation verifying that it was not double charging Avon for any invoiced items and was accurately invoicing the company.  In fact, since April 22, 2022, Avon has paid 130 separate invoices for a total of almost $3 million, and has been continuing to process and pay on a weekly basis all legitimate Fareva invoices.  However, Fareva failed to provide necessary support for many of its other invoices, or issued invoices that are plainly not authorized by the MSA.

43.     Because Avon did not agree to Fareva's demands for payments that the MSA did not authorize, Fareva stopped accepting purchasing orders from Avon and disconnected its ordering system that enabled Avon to order Products on May 2, 2022.  Three days later, on May 5, 2022, Fareva halted manufacturing and supplying a majority of Avon's Products.  Fareva also advised Avon that it would not resume all the required Transition Support under the MSA unless Avon paid all invoices Fareva has issued, regardless of whether they were actually due, regardless of whether Fareva could support them, and regardless of whether Avon contested them.

**E.     Fareva Briefly Resumed Production After Avon Threatened Immediate Legal Action**

44.     In light of Fareva's persistent refusal to manufacture and supply all of Avon's products, by letter dated May 11, 2022, Avon demanded that Fareva comply with its contractual obligations immediately; otherwise, Avon would be forced to seek Court intervention.  That same day, Fareva responded that it would resume production of Avon's products, and in response to a request by Avon for clarification, the next day, on May 12, 2022, Fareva confirmed that it "is resuming the manufacture and supply of Products today."

45.     Although Fareva resumed production at the Morton Grove facility, it failed to do so at the capacity that Avon, and the MSA, required.  Specifically, Fareva advised Avon that it would not fill all of the Orders that Avon placed during the Transition Period in accordance with

the MSA's terms.  Fareva also failed to allocate all manufacturing capacity at the Morton Grove facility to fulfill open Orders for Avon.  Upon information and belief, Fareva used the facility to manufacture products for purchasers other than Avon.  The allocation of capacity to other clients directly conflicted with Fareva's obligations under Section 3.5 of the MSA, which prohibits Fareva, in the event of a Supply Default or Force Majeure Event, from "allocat[ing] any capacity to other Persons unless and until one hundred percent (100%) of [Avon's] Orders are being consistently fulfilled[.]"  A Supply Default in the MSA is defined to mean "any material failure by [Fareva] to deliver any Products in accordance with the requirements of this Agreement and the applicable Order accepted (or required to be accepted) by [Fareva]."  A Supply Default occurred, as Fareva failed to fill numerous Orders that Avon has placed, and which Fareva has accepted.  By way of example, Fareva failed to fill all outstanding orders that Avon placed prior to Fareva's termination of the MSA.  Fareva also informed Avon on June 2, 2022 that in response to its forecasted order of approximately 200 items consisting of 22 million units, Fareva would only deliver about 40 items and 4.6 million units before the expiration of what it defined as the Transition Period.

46.     By letter dated Wednesday, June 1, 2022, Fareva threatened that unless Avon paid invoices totaling almost $21 million by June 3, 2022, Fareva would cease manufacturing at the Morton Grove facility, which would be in direct violation of Fareva's obligations under Section 9.2 of the MSA.

47.     The MSA does not authorize the invoices for which Fareva demanded payment. Accordingly, by letter dated June 2, 2022, Avon informed Fareva that it disputed the invoices Fareva identified and explained why the invoices were not permitted by the MSA.  Avon also

requested written assurance by June 3 that Fareva would comply with its obligations under the MSA to continue to manufacture Avon's products regardless of the dispute over any invoices.

**F.     Fareva Again Stops Production in Violation of the MSA and Refuses to Pay Contract Fees.**

48.     By letter dated June 3, 2022, Fareva explicitly rejected Avon's demand that it continue production and notified Avon it would stop production of all of Avon's products beginning June 6, 2022.

49.     Fareva has not experienced a Force Majeure Event under the MSA to excuse its lack of performance and the breaches that have been alleged.  Although Fareva previously blamed COVID-19 for affecting its performance of certain obligations under the MSA, by letter, dated April 9, 2020, Fareva subsequently notified Avon, on May 4, 2020, that this purported Force Majeure Event was "terminated" and it had proceeded to resume all activities and performance required under the MSA.  Since May 4, 2020, Fareva has never provided written notification to Avon that Fareva was experiencing a Force Majeure Event, which under Section 14.10 of the MSA requires Fareva to describe the nature of such a purported Force Majeure Event, its anticipated duration, and any action being taken to avoid or minimize its effect.  Accordingly, Fareva is obligated to fill all of Avon's outstanding Orders, resume all required Transition Support services, manufacture and supply the Products for at least a six-month period, and pay the Early Termination Fee for the full or partial contract year for the remaining Initial Term under the MSA.

50.     Not only has Fareva stopped production, it has also refused to pay tens of millions of dollars that it owes Avon as a result of its failure to timely fill Avon's properly placed orders.

51.     The MSA requires Fareva to meet certain specifically defined service levels by, among other things, filling Avon's Orders on time.  If Fareva fails to satisfy those service levels,

13

the MSA requires Fareva to pay Avon in accordance with certain calculations that are set forth in the MSA ("Net Level Service Payment").

52.     Between 2020 and today, Fareva has consistently failed to satisfy the service levels that the MSA requires, and owes Avon more than $78 million in Net Service Level Payments as a result.

53.     On or about May 3, 2022, Avon issued four separate invoices totaling $78,799, 153 for Net Service Level Payments between 2020 and 2022:

        a)     Invoice No. 991820 requires Fareva to pay $6,582,174 for 2020 Net Service Level Payment;

        b)     Invoice No. 991821 requires Fareva to pay $51,488,365 for 2021 Net Service Level Payment;

        c)     Invoice No. 991822 requires Fareva to pay $18,612,958 for January-March 2022 Net Service Level Payment; and

        d)     Invoice No, 991823 requires Fareva to pay $2,135,656 for April 2022 Net Service Level Payment.

54.     Fareva has refused to pay any of the Net Service Level Payments that it owes Avon without any legitimate basis.

## COUNT I

## BREACH OF CONTRACT

55.     Avon repeats and re-alleges the allegations contained in paragraphs 1-54 as if fully set forth herein.

56.     Avon has performed its obligations under the MSA.

14

57.     Fareva has breached and continues to breach the MSA by (i) refusing to fill all outstanding Orders that Avon has placed and to provide Transition Support and resume the supply of Products as set forth in Section 9.2 of the MSA; (ii) improperly allocating factory capacity to other customers when it must first consistently fulfill 100% of Avon's Orders as set forth in Section 3.5 of the MSA; (iii) failing to pay the Early Termination Fee as set forth in Section 13.3(d) of the MSA; and (iv) failing to pay the 2020-2022 Net Service Level Payments.

58.     In engaging in the conduct and breaching the MSA as set forth above, Fareva has acted willfully by denying Avon the rights to the supply of Products under the MSA.

59.     Avon has suffered and will continue to suffer damages on account of Fareva's breach of the MSA.

60.     Given that Fareva gave Avon only thirty days' notice that Fareva would not continue to supply hundreds of Products under the MSA, Avon cannot secure an alternate supplier of Products before it exhausts the inventory of Products it has on hand.

61.     If Fareva does not continue to supply Products for a minimum of six months and provide Transition Support under the MSA so Avon may be able to secure an alternate supplier, Avon will suffer damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

## COUNT II

## DECLARATORY JUDGMENT

62.     Avon repeats and re-alleges the allegations contained in paragraphs 1-61 as if fully set forth herein.

63.     By virtue of the foregoing, there is an actual and present controversy between Avon and Fareva that is amenable to resolution by declaratory judgment.

15

64.     Avon is therefore entitled to a judgment and order of this Court which requires Fareva to perform its obligation under Sections 3.5 and 9.2 of the MSA, and in particular that it (i) take all actions reasonably requested by Avon; (ii) use commercially reasonable efforts to transition responsibility for manufacturing and supplying Products as efficiently and reasonably as possible with minimal disruption to Avon's business or the quality and availability of such Products; and (iii) continue to manufacture and supply Products as directed by Avon in accordance with the MSA, including by allocating Fareva's production capacity at the Morton Grove facility exclusively to manufacture Avon's Products at least until Fareva fills all outstanding Orders that Avon has placed as required by the MSA.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants as follows:

(a)     Granting injunctive relief compelling Fareva to continue to supply Products and provide Transition Support services under the terms of the MSA, including but not limited to, allocating Fareva's production capacity at the Morton Grove facility exclusively to manufacture Avon's Products at least until Fareva fills all outstanding Orders that Avon has placed;

(b)     Declaring that Fareva is in breach of the MSA, and that Fareva is required to (i) fill all outstanding Orders that Avon has placed, (ii) provide Transition Support services and otherwise manufacture and supply Products to Avon during the Transition Period under the terms of the MSA, including but not limited to, allocating Fareva's production capacity at the Morton Grove facility exclusively to manufacture Avon's Products at least until Fareva fills all outstanding Orders that Avon has placed, and (iii) pay the Early Termination Fee for each full or partial contract year remaining in the Initial Term of the MSA and the 2020-2022 Net Service Level Payments;

16

(c)     Awarding compensatory damages to Avon in an amount which exceeds $75,000, including indirect, special, unforeseen, and consequential damages, including lost profits and damages to image and goodwill;

(d)     Awarding applicable interest to Avon on any judgment;

(e)     Awarding attorneys' fees and costs to Avon; and

(f)     Awarding such other and further relief as this Court may deem just and appropriate.

**JURY DEMAND**

Wherefore Plaintiffs demand a trial by jury on the within causes of action.

Dated:  New York, New York
      June 6, 2022

KELLEY DRYE & WARREN LLP

By: _____

Robert I. Steiner
David I. Zalman
Malavika Rao
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
rsteiner@kelleydrye.com
dzalman@kelleydrye.com
mrao@kelleydrye.com

*Attorneys for Plaintiffs*

17

4876-2900-3551v.9