UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

THE AVON COMPANY f/k/a NEW AVON LLC and LG H&H COMPANY, LTD.,

Plaintiffs,

-against-

FAREVA MORTON GROVE, INC. and FAREVA S.A.,

Defendants.

-------------------------------------------------------- X

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

22 Civ. 4724 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

On June 6, 2022, Plaintiffs The Avon Company, *formerly known as* New Avon LLC, and LG H&H Co., Ltd. (collectively "Plaintiffs"), sellers of beauty products, brought this suit against Defendants Fareva Morton Grove, Inc. and Fareva S.A. (collectively "Defendants"), seeking declaratory and injunctive relief and damages, caused by Defendants' breach of a long-term Manufacturing and Supply Agreement (the "MSA") (ECF No. 7-1), pursuant to which Defendants agreed to manufacture and supply a substantial number of Plaintiffs' products. The MSA allows Defendants to terminate the MSA early in two circumstances—first, if Plaintiffs fails to pay a "material undisputed" amount within 60 days after receipt of written notice, or second, for convenience, with two-years written notice and payment of an early termination fee. In either case, the MSA requires that Defendants provide Transition Support and continue producing Plaintiffs' products for a period of up to six months, while production is being transferred to another supplier.

On March 29, 2022, citing Plaintiffs' failure to pay a November 2021 invoice, Defendants gave Plaintiffs 30-day's written notice of early termination, triggering an

approximate May 1, 2022 termination date and the beginning of the six-month period during which Defendants were obligated to provide Transition Support. On June 1, 2022, Defendants notified Plaintiffs that if they failed to pay somewhere between $8 and $21 million by June 3, 2022, Defendants would cease production of Plaintiffs' products. On June 2, 2022, Plaintiffs responded, disputing the invoices and requesting written assurance that Defendants would continue to manufacture Plaintiffs' products regardless of the dispute over the invoices. On June 3, 2022, Defendants rejected Plaintiffs' demand and notified Plaintiffs' that they would stop production of all products starting June 6, 2022. Accordingly, Plaintiffs filed this suit and simultaneously moved for an order to show cause for emergency relief, seeking a temporary restraining order ("TRO") and preliminary injunction under Fed. R. Civ. P. 65. (ECF Nos. 1 (Complaint "Compl."), 5 (Motion), 6 (Memorandum)). On June 7, 2022, I ordered counsel for all parties to appear the next day to address Plaintiffs' request for injunctive relief. With the parties' consent, I held over the motion for a TRO and set an expedited briefing schedule for Plaintiffs' motion for a preliminary injunction, with argument to be held on June 16, 2022. Having reviewed the parties' briefing and heard arguments on the merits, for the reasons discussed below, I hold that Plaintiffs are entitled to injunctive relief and grant the motion for a preliminary injunction.

## BACKGROUND

Plaintiff Avon is a leading beauty company that develops and commercializes quality beauty products in North America. Compl. ¶ 15.[1] Plaintiffs sells their goods in the highly-competitive direct selling market, relying on Independent Sales Representatives who sell the products to their friends, family, and others within their communities. ¶¶ 16–17. Plaintiffs

[1] Unless otherwise noted, "¶" refers to paragraphs from the Complaint, ECF No. 1.

rely on the relationships and goodwill that their representatives develop with their customers, and with a reliable flow of goods to support their sales efforts. ¶ 17.

***The MSA***

Prior to 2018, Plaintiffs owned several manufacturing sites, including the site at Morton Grove, Illinois (now owned and operated by Defendants). ¶ 18. Over the years, Plaintiffs consolidated their manufacturing to the Morton Grove facility and, since 2012, the vast majority of their products have been exclusively manufactured at Morton Grove. ¶ 19. On December 1, 2018, Plaintiffs sold the Morton Grove facility to Defendants, pursuant to an Asset Purchase Agreement. ¶ 20. The parties also simultaneously executed the MSA, under which Defendants agreed to manufacture, test, and supply virtually all of Avon's beauty products for a 10-year period, with an option to extend for an additional five years. ¶ 20. Plaintiffs sold Defendants the Morton Grove Facility for tens of millions of dollars below the value of the facility in exchange for Defendants' agreement to manufacture Plaintiffs' products at a discount rate. Defendants also agreed to a fixed rate price per unit for the first five years, to accept and fulfill each order placed by Plaintiffs so long as Plaintiffs satisfied minimum ordering requirements ("Realized Volume") but did not exceed a projected ceiling, and to perform specified quality control measures. ¶ 23; *see also* MSA § 2. As to Realized Volume, the MSA defined that term to obligate Plaintiffs meet the minimum ordering requirements, "regardless of whether the Product . . . [is] delivered in the applicable Contract Year." *Id.* art. I (defining "Realized Volume").

In exchange for Defendants' agreement to manufacture and supply Plaintiffs' products, Plaintiffs agreed to pay for the same at prices agreed upon by the parties, subject to an upward or downward variance based on fluctuations in the cost of production materials, to be

calculated by Defendants. *Id.* § 4.1(b). In the case of an upward variance, Plaintiffs would owe Defendants for the increased costs, and in the case of a downward variance, Defendants would owe Plaintiffs the differential. *Id.* Both are payable within forty-five days of Defendants' calculation of the variance, but if a dispute arises, then the forty-five-day timeframe applies only to the undisputed portion of the variance. *Id.* In addition, under Section 4.1(l), Plaintiffs retain the right to audit Defendants' premises and records for compliance with the MSA and verifying the amounts paid or payable pursuant to the MSA. *Id.* § 4.1(l).

By virtue of the MSA, Defendants became the primary (or exclusive[2]) supplier for a significant portion of Plaintiffs' products, and as relevant here, the MSA includes the following protective provisions.

Although both parties could terminate the MSA, Section 13.3(c) limits Defendants' right to terminate to two circumstances:

> (i) upon thirty (30) days written notice to [Plaintiffs], if [Plaintiffs] fails to pay a material undisputed amount owed by [Plaintiffs] to [Defendants], within sixty (60) days after receipt of written notice from [Defendants]; or
>
> (ii) upon two (2) years prior written notice to [Plaintiffs] ("Early Termination Notice"), for convenience; provided that, (a) the Early Termination Notice may not be given by [Defendants] prior to January 1, 2022, effective January 1, 2024, (b) termination shall not be effective if [Defendants were] in material breach of this Agreement as of the date of the Early Termination Notice or materially breaches this Agreement between the date of the Early Termination Notice and the specified effective date of termination, and (c) termination shall not be effective if Supplier has not paid [Plaintiffs] the Early Termination Fee set forth in Section 13.3(d) or any other amounts owed to [Plaintiffs] pursuant to this Agreement; provided further, that following receipt of an Early Termination Notice, [Plaintiffs] may elect to waive the exclusions in clause (b) or (c) and allow this Agreement to terminate on the specified effective date of termination.

[2] Section 2.2 expressly provides for nonexclusivity—that is Plaintiffs were not obligated to use Defendants as their supplier. *See* Manufacturing and Supply Agreement ("MSA") § 2.2, ECF No. 7-1. However, in practice, Plaintiffs relied on Defendants to produce virtually all their beauty products.

MSA § 13.3(c)(i)–(ii).[3] In addition, in the case of expiration or early termination, Section 9.2 requires Defendants to provide Transition Support:

> In the case of an expiration or a termination of this Agreement for any reason, a Supply Default, or a Force Majeure Event materially affecting [Defendants'] ability to supply the Products, for a period of up to six (6) months (the "Transition Period") [Defendants] shall take all actions reasonably requested by [Plaintiffs], and otherwise use [Defendants'] commercially reasonable efforts, to transition responsibility for manufacturing and supplying the Products from [Defendants] to the applicable Manufacturing Recipients, as quickly and efficiently as reasonably possible with minimal disruption to [Plaintiffs'] business or the quality or availability of Products (such actions and efforts, the "Transition Support"). Unless otherwise directed by [Plaintiffs], [Defendants] shall perform the Transition Support in accordance with the Transition Plan (to the extent it exists and is applicable). Such transition may be on a temporary or partial basis in the event of a Supply Default or Force Majeure Event. During the Transition Period, [Defendants] shall continue to manufacture and supply Products, as directed by [Plaintiffs], in accordance with the terms of this Agreement, subject to Section 14.10 in the event of a Force Majeure Event. In the case of a termination of this Agreement for any reason, the term of this Agreement shall automatically extend for the full duration of the Transition Period as necessary for [Defendants] to perform [their] obligations under this Article IX. Transition Support shall include the following, to the extent reasonably requested by [Plaintiffs]:
>
> > (a) documenting production processes and procedures, including Manufacturing Know-How;
> >
> > (b) training personnel of Manufacturing Recipients on production processes and procedures and Manufacturing Know-How;
> >
> > (c) identifying equipment and Tooling, and cooperating with Manufacturing Recipients in obtaining replacement equipment and Tooling; and
> >
> > (d) identifying all third-party suppliers and providing bills of materials and other information.

MSA § 9.2. Finally, as one other means of ensuring constant supply of products, Section 3.5 provides:

> In the event of a Supply Default or Force Majeure Event, (i) [Defendants] shall resume supply of the affected Products as soon as commercially practicable, (ii)

[3] A termination under Section 13.3(c)(ii) also required Defendants to pay $4,000,000 for each year (or partial year) remaining on the contract. *See* MSA § 13.3(d).

> [Defendants] shall not allocate any capacity to other Persons unless and until one hundred percent (100%) of [Plaintiffs'] Orders are being consistently fulfilled, (iii) [Defendants] shall keep [Plaintiffs] regularly apprised of the status of [their] efforts to resume supply of the affected Products, (iv) at [Plaintiffs'] request, [Defendants] shall use commercially reasonable efforts to engage an alternative supplier of the affected Products (in which case [Defendants] will be responsible for any increase in price for the Products in excess of the Price for such Products and any other [Plaintiffs'] costs in connection therewith) and (v) in any Contract Year that a Supply Default or Force Majeure Event occurs or continues, the Reference Volume for such Contract Year shall be reduced by the greater of (a) the number of units of Products that [Defendants] would have purchased from [Defendants] had the Supply Default or Force Majeure Event not occurred but that [Plaintiffs] did not purchase from [Defendants] and (b) the number of units of Products (or substantially similar products) that [Plaintiffs] purchases or agrees to purchase from alternative suppliers. In the event of a Supply Default or Force Majeure Event, [Plaintiffs] shall use reasonable efforts to limit the number of units of Products it purchases from an alternative supplier to [their] effective needs and any other amounts reasonabl[y] necessary to ensure uninterrupted service for [Plaintiffs'] customers and representatives and to otherwise protect [Plaintiffs'] business.

MSA § 9.2. Supply Default "means any material failure by [Defendants] to deliver any Products in accordance with the requirements of this Agreement and the applicable Order accepted (or required to be accepted) by [Defendants,]" MSA art. I, and Force Majeure Event includes "fires, floods, earthquakes, embargoes, shortages, strikes, epidemics, quarantines, war, acts of war (whether war be declared or not), terrorist acts, insurrections, riots, civil commotion, acts of God, or acts, omissions, or delays in acting by any Governmental Authority, in each case to the extent beyond the reasonable control of the non-performing Party . . . ." MSA § 14.10. Finally, Section 14.2 provides that New York law governs. MSA § 14.2.

***Background to the Instant Dispute***

On March 29, 2022, Defendants gave notice of early termination under Section 13.3(c)(i), citing Plaintiffs' failure to pay an invoice dated November 21, 2021 for $621,000. ¶ 29. Defendants claimed that the amount was "undisputed;" however, Plaintiffs allege that they did dispute the invoice because the invoice overstated the amount owed and did not include

certain offsets owed under the MSA, and that Defendants knew of the dispute based on numerous conversations between the parties. ¶¶ 29–30. In a showing of good faith, and with the hopes of continuing discussions to resolve the dispute over the November 21 and other purportedly erroneous invoices, on March 30, 2022, Plaintiffs paid the $621,000 and notified Defendants of the same. ¶¶ 31, 33.

On April 5, 2022, Defendants informed Plaintiffs that notwithstanding the payment, they would "maintain the termination." ¶ 32. On April 7, 2022, Plaintiffs advised Defendants that the conditions for early termination under Section 13.3(c)(i) had not been met because the $621,000 was not a "material undisputed" amount, and that in any event, Plaintiffs had paid the invoice. ¶ 33. The following week, on April 14, 2022, the parties met, and Plaintiffs informed Defendants that they would "respect [Defendants'] decision to terminate" despite the conditions under Section 13.3(c)(i) not having been met. ¶ 34. The parties also agreed that Defendants were required to act professionally and in good faith to transition manufacturing Plaintiffs' products to Plaintiff LG H&H's facility in Guangzhou, China as quickly and efficiently as reasonably possible and with minimal disruption to Plaintiffs' business. ¶ 35.

Notwithstanding the requirement under Section 9.2 that Defendants provide Transition Support, on April 27, 2022, citing financial difficulties, Defendants informed Plaintiffs that they would not supply products after the MSA terminated unless Plaintiffs agreed to (i) immediately pay all allegedly overdue invoices, whether disputed or not; (ii) pay all other invoices already issued within 45 days, whether disputed or not; (iii) pay any new invoices within 7 days of receipt for business done in April 2022; (iv) prepay any new orders (though not required under the MSA); (v) accept a 4-cent price increase (not authorized under the MSA); (vi)

not cancel any placed orders without Defendants' agreement (although the MSA allows cancelation under certain circumstances); and (vii) bear the entire cost of Transition Support services (also not required under the MSA). ¶¶ 39–40. Plaintiffs agreed to pay undisputed current invoices, not cancel placed orders without Defendants' consent, to prepay new orders, and to allow the 4-cent unit price increase. ¶ 40. Defendants still refused to manufacture Plaintiffs' products and demanded that Plaintiffs execute a settlement agreement, waiving any claims against Defendants and agreeing not to sue Defendants for any past breaches of the MSA. ¶ 41.

In further communications, Defendants continued to demand, as a condition to their fully resuming production, that Plaintiffs pay invoices totaling $21 million, some of which were not due until June 12, 2022, and for which Defendants did not provide documentation allowing Plaintiffs to verify the accuracy of the charges. ¶ 42. Although Plaintiffs have paid 130 separate invoices totaling $3 million since April 22, 2022, ¶ 42, because Plaintiffs failed fully to accede to Defendants' demands for payment, Defendants stopped accepting purchasing orders May 2, 2022 and disconnected Plaintiffs' ordering system and, on May 5, 2022, Defendants halted manufacturing and supplying a majority of Plaintiffs' products. ¶ 43. On May 11, 2022, Plaintiffs threatened legal action and, on May 12, 2022, Defendants resumed manufacturing and supply but not at the capacity that Plaintiffs required. ¶¶ 44–45. For example, Defendants failed to fill numerous orders placed prior to the termination of the MSA, and in response to Plaintiffs' June 2, 2022 forecast of needing approximately 200 items, consisting of 22 million units during the Transition Period, Defendants informed Plaintiffs that they would only deliver about 40 items and 4.6 million units. ¶ 45. Defendants also refused to allocate all manufacturing capacity, as

provided by Section 3.5 of the MSA, to fulfill open orders for Plaintiffs, and instead applied manufacturing capacity to fill the orders of other customers. ¶ 45.

Finally, on June 1, 2022, Defendants informed Plaintiffs that unless they paid invoices totaling almost $21 million,[4] they would cease manufacturing on June 3, 2022. ¶ 46. On June 2, 2022, Plaintiffs notified Defendants that they disputed the invoices and explained why they did not conform to the MSA; they also requested written assurance by June 3, 2022 that Defendants would continue manufacturing regardless of the dispute over the invoices. ¶ 47. On June 3, 2022, Defendants rejected Plaintiffs' demand and notified Plaintiffs that they would stop producing all Plaintiffs' products beginning June 6, 2022. ¶ 48. Defendants did as they stated they would, and so Plaintiffs brought this suit on June 6, 2022, alleging that Defendants are in breach of Section 9.2 for failing to provide Transition Support, and in breach of Section 3.5 for failing to devote 100 percent of production capacity to fulfill all outstanding orders. Plaintiffs moved for a TRO and a preliminary injunction requiring Defendants to continue manufacturing Plaintiffs' products as required under Section 9.2 while Plaintiffs transitioned manufacturing and supply to another facility.

The parties appeared on June 7, 2022. With their consent and the absence of irreparable damage by a short extension, I declined to grant a TRO, set June 13, 2022 June 15, 2022 as the dates for opposition and reply papers, and set June 16,2022 to hear Plaintiffs' motion for a preliminary injunction. I have considered the arguments in the parties' briefs and heard oral argument and, for the reasons discussed below, grant Plaintiffs' motion for a preliminary injunction.

---

[4] According to Defendants' opposition, the outstanding invoices total approximately $8 million. *See* Opposition ("Opp.") at 10–11, ECF No. 22. At oral argument, the parties informed me that the amount in dispute has been reduced to approximately $4.7 million.

## DISCUSSION

I. Legal Standard

Under Fed. R. Civ. P. 65, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58 (citing *Winter v. NRDC, Inc.*, 557 U.S. 7, 20 (2008)).

II. Analysis

A. Likelihood of Success on the Merits

Plaintiffs allege that Defendants have breached the MSA by failing to perform their obligations under Sections 3.5 and 9.2 of the MSA, including taking all actions reasonably requested by Plaintiffs; using commercially reasonable efforts to transition manufacturing and supplying Plaintiffs' products as efficiently and reasonably as possible with minimal disruption to Avon's business or the quality and availability of such products; and continuing to manufacture and supply the products as directed by Plaintiffs, including by allocating production capacity to manufacture Plaintiffs' products until all outstanding orders have been filled.

Under New York law,[5] to establish a claim for breach of contract, a plaintiff must show: (1) an agreement, (2) adequate performance by one party, (3) breach by the other party, and (4) resulting damages. *See Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (cleaned up); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008); *see also McCormick v. Favreau*, 82 A.D. 3d 1537, 1541 (N.Y. App. Div. 2011); *accord. Twinkle Play Corp. v. Alimar Props., Ltd.*, No. 2018-10896, 186 A.D.3d 1447, N.Y. App. Div. LEXIS

[5] The MSA's choice of law clause provides that New York law shall govern. *See* MSA § 14.2 Governing Law.

5008, at *1 (N.Y. App. Div. 2d Dep't Sept. 16, 2020). It is undisputed that there exists a valid and enforceable agreement, and that Plaintiffs will be, or are being, damaged by Defendants' failure to continue producing Plaintiffs' products during the Transition Period. The questions are whether Plaintiffs likely can establish that they have performed the obligations on their part to be performed, and that Defendants' refusal to produce Plaintiffs' products unless all outstanding invoices have been paid, even those materially disputed, constitutes breach.

Plaintiffs contend, and have established, that they have paid all outstanding invoices except for material disputed charges and, more recently, only the undisputed portions of the outstanding invoices. Defendants have rebuffed these offers, demanding that Plaintiffs pay the full amount, whether or not disputed, and then, after payment, invoke their audit rights under Section 4.1 or, alternatively, sue for damages. Nothing in the MSA obligates Plaintiffs to take either of these routes. Plaintiffs cannot be obligated to pay for disputed charges simply because Defendants issue an invoice and so demand. If that were so, then the word "undisputed" contained in other provisions of the MSA would be mere surplusage. *See, e.g.*, § 4.1(b) (governing the parties' obligations to pay variances and imposing a 45-day period to pay "undisputed" invoices); § 13.3(c)(i) (allowing for early termination upon Plaintiffs' failure to pay outstanding "material undisputed" invoices).

At oral argument, Plaintiffs explained the status of the still-outstanding invoices or charges and the basis for their dispute and refusal to pay. Defendants contend that Plaintiffs owe Defendants for their failure to meet minimum ordering requirements in 2020. Although Plaintiffs concede that they ordered less (approximately 79 million units) than the contractually-obligated amount (86 million units), they note that Defendants declared a Force Majeure event (the COVID-19 pandemic and the lockdowns in many States) and were unable to fill Plaintiffs'

orders. Under the circumstances, ordering the contract volume would have been futile. Having heard the parties' positions, I ruled that the dispute was a good-faith dispute and material.

Because Plaintiffs have paid, or stand ready to pay, undisputed portions of all outstanding invoices, and because they are not obligated to pay material disputed charges, I find that Plaintiffs are likely to succeed in proving that they have performed their obligations under the MSA. I further find that Defendants breached the MSA and their obligation to provide Transition Support under Section 9.2 of the MSA. The text of that provision is unequivocal: "During the Transition Period, [Defendants] shall continue to manufacture and supply Products, as directed by [Plaintiffs] . . . ." At present, Defendants have ceased all production, and therefore, are in breach. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.").

Defendants argue that their refusal to produce is not a breach for two reasons. First, they claim that they are required only to manufacture and supply "in accordance with the terms of th[e MSA]," which they construe as meaning that their obligation to performance is conditioned on Plaintiffs' payment of all outstanding invoices, in full. Second, they claim that, even if they are obligated to perform under Section 9.2, that performance does not extend to production because the end of Section 9.2 provides an "exhaustive definition" of the services included in Transition Support. Neither of these arguments is persuasive; both are based on a flawed construction of Section 9.2.

Defendants' focus on the phrase "in accordance with the terms of this Agreement" produces an implausible interpretation of Section 9.2, at least in part because Defendants read the phrase out of context. The full phrase provides that Defendants "shall continue to manufacture

and supply Products, as directed by [Plaintiffs], in accordance with the terms of this Agreement." Fairly read, the phrase "in accordance with the terms of this Agreement" refers to the production-related obligations elsewhere agreed upon, such as the obligation to perform quality control and product testing. Defendants' construction also is implausible because it reads in nonexistent language. Section 9.2 imposes obligations on Defendants; it says nothing of Plaintiffs' reciprocal (if any) obligations. These are sophisticated parties that plainly knew how to be specific and impose limitations in other provisions. Their failure to impose such a limitation or obligation in Section 9.2 is strong evidence that the omission was intentional. *See Kaplan v. Cott Beverage Corp.*, 27 Misc. 2d 655, 656–57 (Sup. Ct. N.Y. Co. 1961) ("[T]he real intent of the parties may be shown by their conduct.").

Defendants' contention that continued production is not required because Section 9.2 provides an exhaustive definition of Transition Support also is without merit. Here, Defendants point to the end of Section 9.2, which states that

> Transition Support shall include . . .
>
> (a) documenting production processes and procedures, including Manufacturing Know-How;
>
> (b) training personnel of Manufacturing Recipients on production processes and procedures and Manufacturing Know-How;
>
> (c) identifying equipment and Tooling, and cooperating with Manufacturing Recipients in obtaining replacement equipment and Tooling; and
>
> (d) identifying all third-party suppliers and providing bills of materials and other information.

MSA § 9.2. Defendants ignore the earlier and unequivocal provision that Defendants "shall manufacture and supply." Nothing in the provision indicates that the enumerated list cited by Defendants was intended to limit the scope of Defendants' obligation to perform Transition

Support. To the contrary, this enumerated list expands the scope of Defendants' obligations to not only continue performing their previous obligations, "in accordance with the terms of the Agreement," but also to perform additional services in aid of transferring services to an alternative supplier.

Section 9.2 clearly and unequivocally requires Defendants to continue manufacturing and supplying Plaintiffs' products, without limitation, at Plaintiffs' direction and in accordance with the terms elsewhere specified. It further requires Defendants to perform back-end transitional services, relating to production processes, materials, and billing. Defendants' refusal to produce—absent Plaintiffs paying all outstanding invoices, material or immaterial, disputed or not, even though not required under the MSA—is a breach of Section 9.2. I therefore conclude that Plaintiffs have established a likelihood of success on the merits.[6]

B. Irreparable Harm

It is beyond dispute that Plaintiffs have shown irreparable harm—Defendants have been responsible for virtually all production of a substantial number of products and, without products to sell, Plaintiffs cannot remain in business, causing damages that, in total scope, are difficult to prove and probably irremediable. *See Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010) (finding irreparable harm where the defendant-distributor attempted to stop selling to the plaintiff-customer because the plaintiff's product would be off the market entirely while it sought a replacement distributor, leading customers to purchase competitors' products and a potential permanent loss of business); *see also Bionpharma Inc. v. CoreRx, Inc.*, No. 21-CV-10656, 2022 U.S. Dist. LEXIS 15287

[6] Because I find that Defendants' unilateral refusal to produce is a breach of Section 9.2, I need not reach the more complicated question of whether Defendants are obligated to devote 100 percent production capacity under Section 3.5 in order to find a likelihood of success on the merits.

(S.D.N.Y. Jan. 27, 2022) (finding irreparable harm even though the plaintiff could eventually find an alternative supplier, in the interim, the plaintiff would be unable to fill pending orders or to accept new orders, both resulting "in substantial injury to [the plaintiff's] reputation and goodwill in the . . . industry").

Defendants argue that Plaintiffs fail to establish irreparable harm because Plaintiffs were not required to use Defendants as their exclusive supplier and therefore the cited injury is of Plaintiffs' own making. This argument misses the mark. That Plaintiffs had the right not to rely so heavily on Defendants has nothing whatever to do with whether Defendants have the right not to perform their obligations under the MSA. Defendants agreed to manufacture and supply Plaintiffs' products and retained no right to refuse to perform other than as specified. Moreover, the cited right of nonexclusivity was one afforded Plaintiffs. Plaintiffs were free to exercise the right or not, and Defendants could not (and cannot) force Plaintiffs to exercise it. Plaintiffs had the right to rely heavily (or not) on Defendants, and their decision to do so does not render their injury not irreparable.

Alternatively, Defendants contend that because Plaintiffs' new supplier is their own facility in China, that Plaintiffs have control over the transition process, obviating the need to force Defendants by preliminary injunction to provide Transition Support. In addition, they argue that although the MSA provides for Transition Support for a period of "up to" six months, Plaintiffs are not required to use that full period. Here again Defendants' arguments miss the mark and attempt to turn Plaintiffs' contractual rights on their head. This six-month term was clearly included to provide protection for Plaintiffs, not as a favor to Defendants. The fact that Plaintiffs' new supplier is owned by Plaintiffs is irrelevant, as is Plaintiffs' ability to request Transition Support for a shorter period of time. Plaintiffs are contractually entitled to six months

of Transition Support. Plaintiffs have not transitioned manufacturing and supply as of this time, and unless Defendants resume production, Plaintiffs will have no products to sell.

In sum, Plaintiffs were entitled to, and did, rely on Defendants to manufacture a substantial portion of their products. Absent Defendants' compliance with their obligations under Section 9.2, Plaintiffs will be unable to sell products during the Transition Period, generating immediate loss, and failure of their business and consequent loss of their goodwill, and termination of employment for their workers and salespeople. All of this suffices to establish irreparable harm warranting injunctive relief. *See Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 906 (2d Cir. 1990) ("[I]n cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product."); *see also John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 29 (2d Cir. 1978) (finding irreparable injury when "plaintiff is deprived totally of the opportunity to sell an entire line of merchandise and may incur injury to its goodwill and reputation as a dependable distributor") (internal quotations omitted).

C. Balance of Hardships

The balance of hardships tip decidedly in Plaintiffs' favor. An injunction will maintain the status quo and require Defendants to continue doing only as they had been doing previously, and only for a period of four and a half months (based on the March 29, 2022 early termination notice, creating an effective termination date of approximately May 1, 2022 and a six-month Transition Period ending October 31, 2022). *See Reuters, Ltd.*, 903 F.2d at 909

(finding balance of hardship in the movant's favor where preliminary injunction would require the nonmovant to "do only what it ha[d] done for the past five years").

Defendants disagree and make two arguments as to why the balance of hardships tip in their favor. First, they argue that the balance of hardships does not tip in Plaintiffs' favor because Defendants have agreed to perform contingent on Plaintiffs' payment. They argue that forcing Defendants to produce regardless of whether Plaintiffs pay would transform a bilateral contract into a unilateral one. This would not maintain the status quo and would impose harm on Defendants by forcing them to absorb the costs of production. Second, Defendants argue that Plaintiffs will not be harmed if denied an injunction because they could simply accede to Defendants' demands for full payment, a harm that is compensable in money damages.

Neither of Defendants' arguments are persuasive. Defendants' contention that denying the injunction would preserve the status quo rests on the unsupported assumption that Plaintiffs must pay all outstanding invoices and charges, undisputed or not. Nothing in the MSA so requires. Defendants also mischaracterize Plaintiffs' position. Plaintiffs have not unilaterally refused to pay while demanding Defendants' unilateral performance. In fact, they have acceded to several of Defendants' demands, none required under the MSA, including to pay invoices for new orders up front. To deny the injunction would effectively rewrite the MSA to give Defendants' the right to unilaterally impose new requirements on their performance. *Cf. Diversified Mortg. Invs. v. U.S. Life Ins. Co. of New York*, 544 F.2d 571, 576 (2d Cir. 1976) (forbidding injunctive relief "as a device for creating a new contract between the parties").

In addition, Defendants' contention that Plaintiffs will suffer no harm because they can simply pay as Defendants demand and recover money damages is really an argument about lack of irreparable injury. It also ignores the uncompensable damages caused by a

permanent loss of business, loss of goodwill, and terminations of employments. And as to the harm to Defendants caused by forcing them to absorb up-front production costs, this is based on a mischaracterization of Plaintiffs' position. As noted above, Plaintiffs have not suggested that they do not intend to compensate Defendants. Indeed, since April 2022, Plaintiffs have paid some $3 million for products received across approximately 130 invoices. The harm that Defendants claim they will suffer if I grant the injunction is baseless. Moreover, just as Plaintiffs would be entitled to recover money damages, so too would Defendants.

In sum, I find that the balance of hardships tip decidedly in Plaintiffs' favor. The harm to Defendants from an injunction is hard to see; they continue to have to produce products in accordance with the MSA, and for agreed payments. Plaintiffs, on the other hand, will suffer business failure because absent the injunction, Plaintiffs will have no products to sell, and be forced out of business.

D. Public Interest

Granting a preliminary injunction is in the public interest because it serves the strong public policy of enforcing valid contracts. *See, e.g.*, *Rex Med.*, 754 F. Supp. 2d at 626; *159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 132 (N.Y. 2019) (recognizing that New York courts "have long deemed the enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law"). In addition, I find that the public interest also will be served because it ensures that Plaintiffs' products will remain on the market, *see Bionpharma Inc.*, 2022 U.S. Dist. LEXIS 15287, at *26, and allow Plaintiffs to uphold their own obligations to their sales representatives and customers. Should I deny relief, Plaintiffs likely will lose their business and harm the public; it would allow Defendants' to "skirt [their] obligations at [Plaintiffs' and the public's] expense." *Rex Med.*, 754 F. Supp. 2d at 26.

Defendants argue that a preliminary injunction is not in the public interest because Plaintiffs' cosmetics are not critical to the marketplace, distinguishing as an example, *Bionpharma Inc.*, 2022 U.S. Dist. LEXIS 15287, as a case involving critical medicine. They claim that the nature of the product motivated the district court to issue the preliminary injunction. However, in that case, Judge John Koeltl granted the injunction not, as Defendants contend, because the plaintiffs produced medication, but rather because they offered a cheaper generic version, and that depriving the market of the plaintiffs' product would force patients to suffer both higher costs and the burden of switching medications. The same can be said of Plaintiffs' products and their absence from the market. The case law does not require that a plaintiff make a "critical" product in order for an injunction to be in the public interest.

Alternatively, Defendants argue that requiring unilateral performance would be contrary to the public policy of enforcing valid contracts. As noted above, this is a straw man argument, directed at a nonexistent state of affairs. Plaintiffs do not claim a right to breach their obligations, and they simply seek a preliminary injunction that would require both parties to perform their obligations as required under the MSA and prevent Plaintiffs from suffering irreparable harm.

In sum, I find that granting the preliminary injunction is in the public interest because it serves the strong public policy of enforcing valid contracts, ensures that the public will have the continued benefit of Plaintiffs' products, and prevents business failure and loss of income and employment to many people.

In addition, under Fed. R. Civ. P. 65(c), a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." Defendants have failed to show that they would suffer any damages from a preliminary injunction. In the circumstances, a bond of $10,000 is sufficient.

**CONCLUSION**

For the reasons discussed above, the motion for a preliminary injunction is granted. Defendants shall perform their obligations under Section 9.2 of the MSA, which requires that they provide Transition Support for a period of up to six months, starting May 1, 2022 and extending no later than October 31, 2022, including manufacturing and supplying Plaintiffs' products as Plaintiffs direct and in compliance with the specifications set forth in the MSA. Plaintiffs, by June 28, 2022, shall also provide security, in the amount of $10,000, as required under Fed. R. Civ. P. 65(c).

The injunction is effective immediately. However, the parties will settle an order by June 28, 2022, submitting one form of order with any disagreements or alternatives shown in that submission, along with a joint letter explaining the respective positions. The parties shall appear for a status conference on July 8, 2022, at 10 a.m. The Clerk of Court shall terminate the motion (ECF No. 5).

SO ORDERED.

Dated: June 4, 2022
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge