UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE AVON COMPANY, f/k/a NEW AVON LLC, and LG H&H COMPANY, LTD.,

Plaintiffs,

-against-

FAREVA MORTON GROVE, INC. and FAREVA S.A.,

Defendants.

**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

22 Civ. 4724 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

1. This trial set out to determine the enforceability of two liquidated damages clauses in the parties' long-term Manufacturing and Supply Agreement ("MSA").

2. Prior to trial, I issued numerous orders resolving other issues in the case, including holding that Fareva improperly terminated the MSA (ECF No. 332), that Fareva bears the burden of proof on the unenforceability of the liquidated damages provisions (ECF Nos. 463, 525), and that Avon cannot seek lost profits as actual damages but may use lost profits as a measure of reasonableness of the liquidated damages provisions (ECF No. 510). I also defined the temporal scope of damages: Net Service Level Payments ("NSLP") pursuant to Schedule D shall be calculated from May 4, 2020 to December 17, 2022, Early Termination Fee from January 1, 2024 to December 31, 2028, and if liquidated damages are not available actual damages shall be calculated through December 31, 2028, the end of the original term of the MSA. ECF No. 510.

3. The bench trial began on July 13, 2026, took place over thirteen days and ended on August 19, 2026.

4. I heard live testimony from seven fact witnesses: Steven Bosson, Thomas Klein,

Christophe Petras, Benson Seo, Courtney Kelly, Dongseok Kang, and Laura Sosa. By deposition designations I also heard testimony from Paul Cali, Sean Lee, Michael Nelson, and Herve Bichon. And I heard testimony from three expert witnesses: Brent Bersin, Anthony Campanelli, and Christopher Brophy.

## FINDINGS OF FACT

## I. THE PARTIES AND THEIR CONTRACTUAL RELATIONSHIP

5. Fareva is an industrial manufacturer in the household and industrial, beauty makeup, pharmaceutical, and active pharmaceutical ingredient sectors. Fareva S.A. is a Luxembourg company with its principal place of business in Luxembourg. Fareva Morton Grove, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Illinois.

6. The Avon Company f/k/a New Avon Company f/k/a New Avon LLC sells beauty, fashion and home, and health and wellness products to customers in North America, primarily through independent sales representatives. Avon has operated for more than 135 years. The Avon Company is a corporation organized under the laws of the State of Wyoming with its principal place of business in New York. LG H&H is a South Korean company with its principal place of business in Seoul, Korea.

7. In April 2019, LG Household & Health Care, Ltd. n/k/a LG H&H Co., Ltd. ("LG," and collectively with The Avon Company, "Avon") acquired New Avon LLC, the North American Avon business, for $125 million in cash. After the acquisition, New Avon LLC reincorporated as a corporation in Wyoming.

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3). This is a suit between citizens of different states, in which citizens of foreign states

are additional parties. The Avon Company is a corporation organized under the laws of the State of Wyoming with its principal place of business in New York. LG H&H is a South Korean company with its principal place of business in Seoul, Korea. Fareva S.A. is a Luxembourg company with its principal place of business in Luxembourg. Fareva Morton Grove, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Illinois. Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs.

9. To establish diversity of citizenship under § 1332(a), the action must be between "citizens of a State and citizens or subjects of a foreign state," 28 U.S.C. § 1332(a)(2), or between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a)(3). "However, diversity is lacking within the meaning of these sections where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens." *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002).

10. I confirmed the basis for jurisdiction in the opinion and order at ECF No. 578. I concluded that the citizenship of the parties establishes jurisdiction because Avon converted into a domestic corporation from an LLC. Thus, there are both foreign and domestic entities on both sides of the dispute, satisfying diversity jurisdiction. I also held that Avon is a real party in interest to the suit because it retained an interest in the MSA, as its assignment of the MSA to LG was partial. ECF No. 578.

### A. Avon's Business Model.

1. Avon develops and sells beauty and personal care products, including skincare, color cosmetics, and fragrance, among others in the United States and Canada. Tr. 63. Avon also develops and sells home essentials, fashion, and accessories. Tr. 63-64.

2. Mr. Bosson was the President of Sales at Avon from 2019 until 2023 and served as Chief Operating Officer prior to becoming President of Sales. Mr. Bosson testified to Avon's business model.

3. Most of Avon's sales are made through Independent Sales Representatives ("Sales Representatives"), who sell Avon's goods to friends, family, and neighbors. Tr. 67-68. To make those sales, Sales Representatives use brochures, which Avon distributes on a biweekly basis. Tr. 103.

4. Avon bases its business planning around these brochures, which require planning months in advance of the issuance of a brochure. Avon prints the brochures approximately three months before it distributes them to Sales Representatives, and it begins planning the brochures' product offerings approximately eight or nine months before distribution. Tr. 106. Avon operates on two-week business cycles, with 26 cycles per year. Tr. 107.

5. With this months-long business planning process, it was important for Avon to have reliable product delivery, for it was costly or at times not possible to change brochures on short notice if a product was not delivered on time by Avon's suppliers.

6. Avon ordinarily decides what products to feature in its brochures based on a variety of business factors, and it orders the products required to meet the demand that it expects those brochures to generate. Tr. 104-05.

7. Avon pays Sales Representatives commissions for the products they sell. Tr. 67. Avon relies on predictable and timely product supply to plan its product offerings, develop and print brochures, satisfy customer demand, and maintain relationships with Sales Representatives. Tr. 102, 106-07.

8. Product availability is a high priority for Sales Representatives and for Avon, who

cannot earn commissions when products are not available for delivery to their customers. Tr. 66, 109. Further, if Avon is unable to deliver the products identified in the brochures, it was at risk of losing customers and Sales Representatives, as product unavailability caused both the loss of that product's sale and eroded trust in Avon. Tr. 110-11.

9. Avon's business model, relying on brochure campaigns and Sales Representatives, required Avon to have a high level of agility in producing its products and it was important to Avon's business model to have timely delivery of its products.

**B. Morton Grove Facility and Sale.**

1. To maintain such high manufacturing performance and to maintain production agility, Avon custom-built its own manufacturing facility in 1958 in Morton Grove, Illinois (the "Morton Grove Facility"). Avon owned and operated the Morton Grove Facility for decades and it was Avon's primary U.S. manufacturing facility for its personal care and beauty products, creating approximately 65% of Avon's beauty and personal care products. Tr. 255.

2. The products made at Morton Grove included some of Avon's bestselling items, such as items from the Skin-So-Soft line. Avon manufactured certain other beauty and personal care products at other contract manufacturing facilities. Tr. 68-69.

3. Under Avon's management, the Morton Grove Facility supplied the products required by Avon's sales force at an on time and in full rate of 95% or better. Tr. 256, 322. As the owner of the Morton Grove Facility, Avon was also able to employ a high degree of flexibility and agility to produce items or change orders at the last minute to meet demand. Tr. 251-52, 322. This high service level was important to Avon's business model. Tr. 265-66.

4. Beginning in at least 2016, Avon experienced declining sales and numbers of Sales Representatives (declining from $733 million total net sales in 2016 to $188 million in 2023 at a

fairly consistent rate of decline). DDX-A; DDX-B.

5. Corresponding to the sales decline, Avon's usage of the Morton Grove Facility also declined, such that Avon was using approximately 25% of the facility's capacity. Tr. 301.

6. In 2018, Avon decided to sell the Morton Grove Facility. In doing so, Avon sought to capitalize on the underutilized facility, while continuing to manufacture a majority of its personal care and beauty products at the facility.

7. Thus, when negotiating the sale, Avon sought to establish a long-term, stable manufacturing relationship with the buyer of the Morton Grove Facility. In making such a deal, it was important to Avon to maintain similarly high levels of service as it had when Avon owned the Morton Grove Facility.

8. Fareva decided to purchase the Morton Grove Facility from Avon. Avon sold the Morton Grove Facility to Fareva pursuant to an Asset Purchase Agreement ("APA"), dated November 30, 2018, between Avon and Fareva. Tr. 70.

9. In tandem with the APA, Avon and Fareva also entered into a Manufacturing & Supply Agreement, dated December 1, 2018, which set forth terms under which Fareva would manufacture and supply certain New Avon products from the Morton Grove Facility. Tr. 70-71.

10. The APA executed the sale of the Morton Grove Facility to Fareva, while the MSA governed the agreement for Fareva to produce Avon's products at Morton Grove over a ten-year period with the option to renew. The parties intended that the MSA establish a long-term manufacturing relationship pursuant to which the Morton Grove Facility would continue to manufacture the majority of its personal care and beauty products. Tr. 72-73.

11. The MSA and APA were the subject of extensive negotiations, lasting approximately eleven months, between sophisticated parties. Both parties were represented by

counsel.

12. In negotiating the MSA, Avon communicated to Fareva the importance of maintaining similarly high levels of service as Avon maintained when it ran the facility, including the need for its products to be delivered on time and in full, as it was a key priority for Avon. Tr. 265, 267.

13. Thus, over the course of many months Avon and Fareva negotiated the terms of the extensive MSA, which included fixed and discounted conversion costs (defined later) and a formula, in Schedule D, to compensate Avon for harms caused if Fareva failed to fill orders on time and in full.

14. Avon assigned the MSA to LG H&H on September 1, 2020.

15. For the first contract year, in 2019, Fareva performed the contract at a high service level, as expected by the parties. However, in 2020, Fareva's performance began to decline, as Fareva repeatedly had late deliveries of Avon's products. Fareva's performance continued to decline until March 2022 when Fareva terminated the MSA.

16. Fareva purported to terminate the contract for cause, under Section 13.3(c)(i), claiming Avon failed to pay an undisputed invoice. However, I previously ruled that Fareva's termination was one for convenience because the invoice in question was properly disputed. ECF No. 332.

17. The MSA included two liquidated damages provisions that are at issue based on Fareva's termination for convenience: the "Early Termination Fee" of $20 million pursuant to Section 13.3(d) of the MSA and "Net Service Level Payments" pursuant to Schedule D to the MSA.

18. The Early Termination Fee applied where Fareva decided to exercise its right to

terminate the MSA for convenience before the end of its ten-year term. The Early Termination Fee required Fareva to pay $4 million per year to Avon for each remaining contract year on the MSA.

19. Schedule D provides a system of credits paid from one party to the other based on Fareva's ability to meet certain service level goals, namely delivering the products on time and in full. The NSLP damages at issue accrued from 2020 through 2022 when Fareva failed to deliver Avon's orders of products on time and in full.

20. Avon claims that Fareva owes $152,680,076 in NSLP damages for the period May 4, 2020 through December 17, 2022.

## II. OVERVIEW OF THE MSA.

21. The MSA governs the terms of Avon and Fareva's manufacturing relationship. It is a long, complicated contract with multiple schedules, definitions, and clauses.

### A. Conversion Cost Pricing.

1. The core of the MSA sets out the schedules by which Avon ordered products from Fareva and at what prices. Under the agreement, Avon received set, discounted prices from Fareva.

2. The MSA required Fareva to produce the products ordered by Avon, pursuant to certain ordering schedules and at a set price point, as negotiated by the parties. MSA §§ 2.1, 3.1(a), 4.1.

3. Schedule A of the MSA governed the prices Avon paid Fareva to manufacture each item. These prices were set based on the "conversion cost." The conversion cost is the cost Fareva charges, in addition to raw material and freight costs, to produce a unit. Tr. 73. Avon paid Fareva set conversion costs per unit and the full material, freight, and other costs per unit. MSA § 4.1; Tr. 73-74.

4. Under the MSA's definitions, the conversion costs were set at the Schedule A rate for the first five years of the MSA, then would increase according to the CPI rate of inflation each year after the five-year mark. MSA art. I (defining "Adjusted Conversion Cost Per Unit"); Tr. 271, 275.

5. Thus, Avon had set conversion costs it paid Fareva for each product unit, which would be adjusted for inflation after the first five years of the contract.

### B. Ordering Schedules.

1. Section 3.1(a) of the MSA specifies the process by which Avon would order products for Fareva to manufacture and deliver. The MSA requires Avon to provide a non-binding 16-week forecast to Fareva by each Monday, and to place binding orders with Fareva each Thursday, which are to be delivered by Fareva 14 days later (the "Delivery Date"). MSA § 3.1(a).

2. The MSA sets a ceiling on the number of product units in each Order that Fareva is obligated to fulfill—referred to as the "Projected Ceiling." MSA § 3.1(a). The Projected Ceiling varies; it is the number of units of Product that Avon forecasted five weeks and three days before the Delivery Date. MSA § 3.1(a). Fareva is expected to use commercially reasonable efforts to fulfill units over the Projected Ceiling.

### C. Early Termination Fee

1. The MSA's Term was set to expire on December 31, 2028, unless the parties agreed to extend it.

2. The MSA had multiple options for the termination of the contract. The first was the ability for Avon to terminate the agreement for cause, including if Fareva breached the agreement. MSA § 13.3(a)(i).

3. If Avon terminated the agreement under Section 13.3(a), Fareva was required to

pay Avon a Discount Payment under Section 13.3(b), the amount of which varied by year of termination, as set out in Section 13.3(b). MSA § 13.3(b).

4. Second, Section 13.3(c)(i) permitted Fareva to terminate the MSA upon 30 days' written notice if Avon failed to pay an undisputed invoice owed to Fareva. This was the clause Fareva invoked when it purported to terminate the agreement in March 2022.

5. Finally, the MSA under Section 13.3(c)(ii) provided a right for Fareva to terminate the contract early for convenience upon two years' prior written notice. Under this provision, Fareva did not need to assert any cause to terminate the MSA but was required to provide two years' notice of termination, and termination could not be effective prior to January 1, 2024. MSA § 13.3(c)(ii).

> By Supplier. Supplier may terminate this Agreement:
>
> [...]
>
> (ii) upon two (2) years prior written notice to Purchaser ("Early Termination Notice"), for convenience; provided that, (a) the Early Termination Notice may not be given by Supplier prior to January 1, 2022, effective January 1, 2024, (b) termination shall not be effective if Supplier was in material breach of this Agreement as of the date of the Early Termination Notice or materially breaches this Agreement between the date of the Early Termination Notice and the specified effective date of termination, and (c) termination shall not be effective if Supplier has not paid Purchaser the Early Termination Fee set forth in Section 13.3(d) or any other amounts owed to Purchaser pursuant to this Agreement; provided further, that following receipt of an Early Termination Notice, Purchaser may elect to waive the exclusions in clause (b) or (c) and allow this Agreement to terminate on the specified effective date of termination.
>
> MSA § 13.3(c)

6. I previously held that Fareva's termination was one for convenience because Fareva's claimed reason for termination under Section 13.3(c)(i)—Avon's alleged non-payment of an undisputed invoice—was invalid and therefore converted the termination into one for

convenience. ECF Nos. 332, 510. Thus, I held that the termination for convenience triggered the Early Termination Fee and that under the provision's terms the fee would be calculated from January 1, 2024 to December 31, 2028.

7. Section 13.3(d) provides that Fareva must pay Avon an Early Termination Fee if Fareva terminates the contract for convenience under Section 13.3(c)(ii). The Early Termination Fee was set at $4 million per year for each full or partial contract year remaining on the MSA's term, with $333,333 pro-rated for 2018.

> (d) Early Termination Fee. In the event that Supplier provides Purchaser with an Early Termination Notice in accordance with Section 13.3(c)(ii), within forty-five (45) days after the date of the Early Termination Notice, Supplier shall pay Purchaser four million dollars ($4,000,000) for each full or partial Contract Year remaining in the Term following the effective date of such termination ("Early Termination Fee"). Nothing in Section 13.3(c)(ii) or this Section 13.3(d) shall limit Purchaser's right to recover any damages permitted under this Agreement or at Law in the event of Supplier's breach of this Agreement.
>
> MSA § 13.3(d)

8. Thus, the terms of the MSA require Fareva to pay a $20 million Early Termination Fee.

9. Avon sold the Morton Grove Facility to Fareva for a purchase price of $17.5 million.

10. Mr. Bosson testified that the total value of the sale of the Morton Grove Facility was more than the $17.5 million cash price Fareva ultimately paid. Tr. 78-79. Mr. Bosson testified that the deal was negotiated and structured such that Avon was paid for the sale of the Morton Grove Facility through the $17.5 million purchase price and the $4 million per year in conversion cost discounts under the MSA's terms. Tr. 78, 83. The parties valued the conversion cost reductions at $4 million per year, over the ten years of the MSA's term. The conversion costs took

into account inflation adjustments, as defined in the MSA.

11. Mr. Bosson's explanation of the deal structure is reflected in the parties' Letter of Intent dated December 5, 2017, which stated that "Fareva will pay $17.5 m to New Avon on the day of completion, and apply a $4m reduction on the total conversion cost" as part of the "Asset deal" for the sale of the Morton Grove Facility. PX 5.

12. During the negotiations for the sale of Morton Grove, Fareva made Avon other offers with different mixes of cash to other consideration, including an offer for $35 million in cash with no discounts and a $1 nominal offer with high conversion cost discounts. PX-7; Tr. 263.

13. Mr. Klein was Executive Director of Manufacturing at Morton Grove from 2001 to 2017 and served as a consultant to Avon from 2017 until present. In his role as Executive Director, Mr. Klein ran the Morton Grove Facility. Tr. 246-47. Mr. Klein served on the negotiating team for Avon's sale of the Morton Grove Facility to Fareva as a consultant. Tr. 248, 258. Mr. Klein reported to Jacquelyn Marcus, Avon's then-Executive Director of Supply Chain, who was the primary negotiator for Schedule D of the MSA. Tr. 314.

14. Mr. Klein testified that he believed the value of the Morton Grove Facility, at the time of its sale to Fareva, was over $100 million, including a $16 million bare land value. Tr. 261-62.

15. Mr. Petras, former Chief Executive of Fareva's beauty and home business, testified that at the time he negotiated the MSA, he did not believe the Morton Grove Facility was worth more than the $17.5 million paid by Fareva in cash. Tr. 513. However, Mr. Petras was not directly involved in negotiating the APA or the financials of the deal. Nor did Fareva offer any evidence directly rebutting Avon's witnesses' testimony that the conversion cost discounts were part of the Morton Grove transaction.

16. Given Avon's specific business needs, when negotiating the sale of Morton Grove, Avon sought a long-term partnership and continued high levels of service. Tr. 89, 265.

17. However, during the course of negotiations, Fareva insisted that it have an option to terminate the contract for convenience. Mr. Steven Bosson, former Avon President of Sales, was involved in the negotiations of the MSA and APA. Mr. Bosson testified, and the documents in evidence show, that Fareva insisted that the MSA include an option for Fareva to terminate the contract for convenience. Tr. 89-91. Fareva proposed that the termination for convenience include a termination fee to be paid from Fareva to Avon. Tr. 88-92.

18. Mr. Bosson testified that Avon prioritized the long-term nature of the MSA and did not want the MSA to include options for termination for convenience. Tr. 89, 91. However, Avon ultimately agreed to include the provision. Tr. 95-96.

19. I find that the consideration for the purchase of the Morton Grove Facility was both the $17.5 million cash payment and the conversion cost discounts, valued at $40.33 million over ten years.

20. With this background, I find that the Early Termination Fee was negotiated to compensate Avon for the lost conversion cost benefit if Fareva were to terminate the contract before the end of the ten-year term.

### D. Other MSA Provisions: Volume Commitment, Force Majeure, and Step-In Rights.

1. The MSA required Avon to purchase a minimum number of product units from Fareva each year of the MSA (the "Volume Commitment"). Section 2.1 of the MSA requires that Avon order a minimum of 86 million product units from Fareva each year. MSA § 2.1; MSA art. I (defining "Reference Volume"); Tr. 496-97, 832. If Avon failed to meet the Volume Commitment, it owed Fareva a penalty based on the amount Avon was short of the Volume Commitment. MSA

§ 4.1(g). The Volume Commitment penalty was 75% of the average conversion cost for each unit Avon was short of the Volume Commitment. MSA art. I (defining "Penalty").

2. The MSA also provided the ability for Fareva to declare a force majeure. MSA § 3.5. If certain triggering events occurred, including shortages, Fareva could declare a force majeure. MSA §§ 3.5, 14.10. If Fareva declared a force majeure, Fareva was required to prioritize fulfilling Avon's orders over orders of other customers. MSA § 3.5. However, during a declared force majeure, NSLP damages did not accrue.

3. The MSA also included a step-in right for Avon, wherein if Fareva failed to meet certain service requirements that remained unresolved over a period of time, as defined in the MSA, Avon had the right to take control of those portions of the Morton Grove Facility that were causing service failures. MSA § 2.4; Schedule D.

4. The MSA has a saving clause, such that if one part of the MSA is deemed invalid by a court the remainder of the contract and provision should be deemed valid. MSA § 14.9.

5. In the event of termination of the MSA, for any reason, the MSA required a six-month Transition Period, wherein Fareva must "take all actions reasonably requested by [Avon], and otherwise use [Fareva's] commercially reasonable efforts, to transition responsibility for manufacturing and supplying" Avon's products to new manufacturers. MSA § 9.2. This provision was triggered by the termination of the MSA and was the subject of the early litigation and preliminary orders in this case, wherein Avon sought to enforce its transition support rights. *See* ECF Nos. 27, 61, 63.

**E. Net Service Level Payments and Schedule D.**

1. Schedule D provides credits to Avon or Fareva based on the service level provided, meaning based on whether Fareva delivered Avon's orders on time and in full.

2. Under the MSA, Fareva could incur NSLP charges due to Avon in two ways (the On Time and In Full Credits), and Avon could incur credit due to Fareva in one way (New Order Request Bonus). In each week, Avon could earn only one of the On Time and In Full Credits. The credits were calculated for each week based on Fareva's performance and tabulated at the end of each year, netting out credits owed in each direction.

3. The first way Fareva could incur a charge was the On Time Credit. The On Time Credit is calculated based on Fareva's fulfillment of Avon's orders. If Fareva filled at least one product of an Avon order, that order was deemed filled for the purpose of the On Time Credit.

4. If Fareva fulfilled more than 95-97% (the threshold varied by contract year) of Avon's orders in a given week, then an On Time Credit was not calculated. If Fareva fulfilled less than 95-97% of Avon's orders in a given week, it would owe an On Time Credit.

5. The On Time Credit is calculated, in simple terms, at $500 credit for each missed order below the specific margin ratio. The $500 charge applies to the missed orders for the current week and all outstanding missed orders from prior weeks.

6. Specifically, the MSA provides:

> "OT Order" means, with respect to an Order, at least one unit of the Product included in such Order is On Time.
>
> "OT Service Ratio" means, with respect to a particular week, (i) the number of OT Orders with a Delivery Date in such week plus the number of Orders which became Corrected Orders between the Thursday of the prior week and the Thursday of particular week, divided by (ii) the number of Total Orders for such Delivery Date, expressed as a percentage.
>
> "OT Service Ratio Threshold" means ninety-five percent (95%) in the First Contract Year, ninety-six percent (96%) in the second Contract Year, and ninety-seven percent (97%) in the third Contract Year and any subsequent Contract Year.
>
> […]

2. Service Level Credits and Bonuses.

(a) The OT Service Ratio shall be calculated by Purchaser for each week of the Term. In the event that the OT Service Ratio for a week is less than the OT Service Ratio Threshold, Supplier shall pay a service level credit to Purchaser which shall be calculated as follows, expressed in United States dollars ("OT Credit"):

((OT Service Ratio Threshold x Total Orders, rounded to the nearest integer) - OT Orders)

X

$500

For the avoidance of doubt the calculation in this Schedule D, Section 2(a) shall not take into account any NORs.

MSA Sched. D.

7. The second way Avon could earn a credit was the "In Full Credit" which was based on Fareva's delivery of the product units ordered in a given week.

8. If Fareva delivered more than 95% of the product units Avon ordered in a given week, then an In Full Credit was not calculated. If Fareva fulfilled less than 95% of the product units ordered in a given week, it would owe an In Full Credit.

9. The In Full Credit was calculated, in the simplest terms, as a $0.16 charge for every product unit that was undelivered below the 95% ratio. The $0.16 charge applies to the undelivered products for the current week and all outstanding undelivered products from prior weeks.

10. The $0.16 charge is 75% of the average conversion cost of each product Fareva manufactured for Avon under the MSA. Those conversion costs ranged from approximately $0.09 per unit for each lip balm or "roll on" deodorant, to approximately $0.53 per unit for high-end creams and mascaras.

11. Specifically, the MSA states:

> "In Full Service Ratio" means (i) the number of units of Products included in Orders with a Delivery Date in a particular week that are On Time, divided by (ii) the number of units of Products in Orders with a Delivery Date in such week, but in the case of clauses (i) and (ii), excluding any NORs.
>
> "In Full Service Ratio Threshold" means (i) the number of units of Products included in Orders with a Delivery Date in a particular week (excluding any NORs) plus all Missed Products, multiplied by (ii) ninety-five percent (95%).
>
> [...]
>
> (b) The In Full Service Ratio shall be calculated by Purchaser for each week of the Term. In the event that the In Full Service Ratio for a week is less than ninety-five percent (95%), Supplier shall pay a service level credit to Purchaser which shall be calculated as follows, expressed in United States dollars ("In Full Credit"):
>
> (In Full Service Ratio Threshold - number of units of Product On Time - Corrected Products)
>
> X
>
> Average Adjusted Conversion Cost Per Unit x 0.75
>
> For the avoidance of doubt the calculation in this Schedule D, Section 2(b) shall not take into account any NORs.
>
> MSA Sched. D.

12. Both the On Time and In Full Credits are repeating charges. Whether the credits are triggered is based only on the current week's deliveries. However, once triggered, both credits applied to the current week's products and orders and all outstanding orders or products that had not yet been delivered. Thus, for the In Full Credit Fareva was charged approximately $0.16 for every unit every week it was late.

13. The repeating nature of the In Full Credit is based on the definition of "Missed Products" in the definition section of Schedule D, by including in the definition "all units of Products from Orders with a Delivery Date in a prior week that were not released." MSA, Schedule D (defining "Missed Products").

> "Missed Products" means, with respect to a particular week, all units of Products from Orders with a Delivery Date in a prior week that were not released from Supplier's quality control in conformance with the specifications and requirements of this Agreement by the Delivery Date of the prior week.
>
> MSA Sched. D.

14. Schedule D's charges do not account for whether Avon had sufficient inventory of an overdue product to nonetheless fulfill customer orders.

15. The MSA provides that only the greater of the On Time Credit and In Full Credit will apply for each week, and that the NSLPs are to be paid on a yearly basis, payable only if they exceed $20,000. MSA Sched. D §§ 2(c), (e). In practice, the In Full Credit was the more commonly applied of the two, as it consistently yielded a greater sum.

16. Both the On Time and the In Full Credit calculations exclude all New Order Requests ("NORs"). These excluded NORs are instead the basis for a potential bonus to Fareva, to the extent Fareva delivers some portion of those Orders to Avon. An order was considered an NOR if Avon did not include it in the forecast provided three weeks before placing a binding order.

17. Where Fareva delivers at least 50% of the NORs Avon places in a particular week "On Time" (*i.e.*, Fareva delivers one unit of Product in those Orders), it earns a bonus of $250 for each such NOR delivered.

18. Avon claims damages of $152,680,076 from the NSLPs, as calculated by Avon's expert witness Anthony Campanelli. I make no finding as to whether this amount is proper, for

such a decision is reserved for a jury trial on damages, but use it to assess the reasonableness of the provision.

19. Mr. Campanelli also testified that if the In Full Credit were unenforceable, the On Time Credit would result in approximately a $4.3 million credit due from Fareva to Avon for the relevant time period from 2020 to 2022. Tr. 1065-66.

### F. NSLP Negotiations.

1. Schedule D, as detailed above, was the product of extensive negotiations between the parties, lasting almost the entirety of 2018.

2. Mr. Klein, former Executive Director of Manufacturing at Morton Grove, served on the negotiating team for Avon's sale of the Morton Grove Facility to Fareva as a consultant, working under Ms. Marcus. Tr. 258, 314.

3. On Fareva's side, Mr. Petras served as the primary negotiator of Schedule D. Mr. Petras served as Chief Executive of Fareva's beauty and home business from 2023 until July 2026 and served as Senior Vice President for Global Operations of Pharma and Beauty from 2018 to 2023. Mr. Petras testified that he mostly negotiated with Ms. Marcus, who was Avon's primary negotiator for the MSA. Tr. 516, 547.

4. Avon first proposed the idea of a service-based credit system because of the importance of high levels of service. Tr. 289-90, 298. Having a system that would address service levels was a key part of the deal to Avon, and Mr. Klein testified that he did not believe Avon would have pursued the deal if Avon did not believe Fareva would be able to maintain the high level of service at which Avon had operated Morton Grove. Tr. 430-31.

5. In negotiating the NSLPs, Avon first proposed using a "Shorts Model" which was based on when Avon was unable to fulfill the orders its Sales Representatives placed with Avon.

Tr. 298-99, 312.

6. The Shorts Model was calculated by using the "piece fill rate" or the rate at which Avon filled customer orders. Tr. 256. The piece fill rate was measured based on Avon's ability to fill the orders placed by customers through Avon's website.

7. Customer orders were placed with Avon through Avon's website by Sales Representatives or directly by some customers. Tr. 131, 318. An item was considered short if Avon was unable to fill an order placed through its website. Tr. 316.

8. At the outset of the negotiations and prior to 2018, Avon's website allowed Sales Representatives to place orders for items labeled as out of stock on Avon's website. Tr. 131, 318. Avon tracked the data for how many orders were placed for out-of-stock items to calculate its piece fill rate. Tr. 256, 318.

9. An item could be short for a variety of reasons, including production delays by the Morton Grove Facility but also for reasons outside of Morton Grove's control. Tr. 315-16. Avon tracked the different reasons for an order being short using a "Reason Code" system. Tr. 315.

10. When Avon operated Morton Grove, the piece fill rate was consistently around 99%. Tr. 256. Mr. Bosson testified that a piece fill rate of below 97% would be considered catastrophic for Avon's business. Tr. 130.

11. The Shorts Model proposed by Avon would have paid credits to Fareva if it achieved a higher piece fill rate than certain thresholds and paid credits to Avon if Fareva performed at a lower piece fill rate than certain thresholds. Tr. 312-13.

12. Mr. Klein testified that he understood Fareva to prefer an "On Time and In Full" or "OTIF" Model, which would be based on the extent to which Fareva delivered orders that Avon placed with Fareva on time and in full. Tr. 307-08, 320. Mr. Bosson and Mr. Petras testified that

Fareva preferred this model because, unlike the Shorts Model, Fareva's performance under it depended only on factors within Fareva's control. Tr. 133, 542.

13. Fareva had agreed to use the Shorts Model around May 2018. Tr. 533-36, 607.

14. In or around August 2018, Avon decided to move away from negotiating a Shorts Model and instead embraced the OTIF Model. Tr. 320, 542. Mr. Klein testified that Avon made this decision, in part, because Avon was changing its website to no longer allow Sales Representatives to place orders for out-of-stock items, which would remove the key source of data to track piece fill rates in the Shorts Model. Tr. 318-20.

15. After Avon proposed using the OTIF Model, the parties negotiated only on the OTIF Model, eventually reaching the form in the MSA. Tr. 320, 343.

16. Mr. Klein testified that he had worked on the negotiations in detail and did extensive analysis and modeling under both the Shorts and OTIF Models. Tr. 293-94, 313. This modeling was primarily based on using Avon's historical performance levels to determine what the different models would have yielded in NSLPs under historical performance levels. This modeling typically showed NSLP payments in the tens of thousands of dollars, and Mr. Klein testified that he believed one model that resulted in payments of $220,000 for one year was too high. Tr. 457.

17. Mr. Petras similarly testified that he expected the charges to be up to $50,000 per year and that he would not have agreed to a structure that would be likely to incur much higher charges. Tr. 533-36.

18. Mr. Klein testified that the models were intended to capture the harm to Avon if service levels dropped. Tr. 294-95, 302-03. However, Mr. Klein acknowledged that the NSLPs also served the purpose of encouraging Fareva to maintain high levels of service beyond that of a normal manufacturer relationship. Tr. 461.

19. Throughout the negotiations, the parties referred to the NSLPs as a system of "penalties" and "bonuses." Tr. 312, 459, 496. However, the final language of the MSA refers to "credits." MSA Sched. D § 2; Tr. 566.

20. Avon's witnesses acknowledged that they changed their language about calling the NSLPs penalties in response to counsel's advice. Tr. 444, 1417-18.

21. Mr. Klein testified that when using this language his intent was to compensate Avon for harm. Tr. 313-14.

22. Mr. Petras testified that he believed the purpose of Schedule D was to motivate Fareva to maintain high service levels. Tr. 494-95, 536. Mr. Petras testified that he had understood the purpose of Schedule D was to motivate performance and that no one from Avon discussed it with him as a form of compensation for actual harm to Avon. Tr. 490-91, 547.

23. In October 2018, Avon and Fareva reached an agreement on the final general terms for Schedule D, as outlined in an email from Jacquelyn Marcus to Mr. Petras. PX 139; DX-GE. Mr. Petras testified the email outlined the final agreement he and Ms. Marcus reached, which was then to be implemented by Avon and Fareva's attorneys. Tr. 559-61, 564.

24. Mr. Petras testified that the deal he reached with Ms. Marcus did not include the ability for the In Full Credits to repeat weekly. Tr. 553-54, 556, 564. Mr. Petras testified that he would not have agreed to such a term if it was proposed and that the term was added by the lawyers after the parties had reached a final agreement on substantive terms. Tr. 532, 560, 575.

25. In the MSA draft dated November 13, 2018, sent by Avon's attorneys at Kirkland & Ellis, Avon added the definition of Missed Products to Schedule D, which would allow In Full Credits to repeat week-over-week. Tr. 571-72, 595-96; PX 165.

26. Mr. Petras testified that he did not agree to the change at the time and was not aware

of such a change. Tr. 572-74.

27. Fareva's attorney negotiating the MSA, Patrick Mousset, edited the Missed Products definition in a subsequent draft of the MSA to remove the repeating nature of the In Full Credit. Tr. 599-600; PX 166.

28. However, in a subsequent draft, Kirkland & Ellis reverted to the Missed Products definition in their version that included the repeating In Full charge. PX 168. This version of the Missed Products definition was included in the final MSA draft, with the exception of a corrected typo. PX 177; PX 179.

29. Mr. Petras testified that he first became aware of the addition of the repeating aspect of the In Full Credit in March 2021, when Avon sent a letter requesting $6.5 million in NSLPs for the year 2020. Tr. 573-74; DX-A. In a letter in response, Fareva objected to the repeating nature of the In Full Credit in Avon's calculations, stating that interpreting the MSA to include repeating charges "would totally upset the economy of our Agreement and provoke a lack of balance between the obligations of the parties, of course non-compliant with their intention." PX 257.

30. Fareva's counsel represented that, based on Mr. Campanelli's calculations, if the In Full Credit was drafted as a one-time charge the resulting NSLPs for the relevant time period would total approximately $14.5 million. Tr. 1562; *cf.* Part II.E ¶ 19 (stating that Avon's expert found that if only the OT Credit was enforceable the NSLPs would amount to $4.3 million).

## III. AVON'S HARM AFTER FAREVA'S BREACH

### A. Avon's Actual Harm.

1. Avon's sales data shows that from 2016 through 2023, encompassing the time of Fareva's breach on March 29, 2022 by improper termination, Avon's sales revenue and number of Sales Representatives declined. DDX-A, DDX-B.

2. When LG acquired Avon in 2019, it intended to implement a new strategy to increase Avon's growth. Tr. 622. Mr. Seo, Chief Financial Officer of Avon, testified that LG's strategy was to grow Avon's sales by stabilizing Sales Representative attrition, establishing an online sales channel, and entering the mass retail market. Mr. Seo testified that Fareva's breach interfered with this strategy. Tr. 622-24.

3. Fareva's failures to deliver products on time and in full began in 2020 and continued through the termination of the MSA in 2022. Tr. 772. Ms. Sosa, Avon Senior Manager for Beauty Sourcing and Planning, testified that Fareva's late deliveries and failures to complete orders began in 2020 and worsened as time went on. Tr. 772. Ms. Sosa oversaw the ordering and supply planning relationship with Fareva and met with Fareva regularly about ordering in 2020-2022. Tr. 771-72, 779, 831.

4. The degree of Fareva's service failures in this time period was extreme. Avon accumulated backlogs of millions, up to tens of millions, of units that Fareva failed to produce, and Fareva frequently delivered less than 25% of Avon's products on time. Tr. 1014.

5. Ms. Sosa testified that from 2020 through 2022, it was difficult to make business plans or otherwise plan orders because Fareva would overpromise on its ability to deliver on time. Tr. 773. Ms. Sosa testified that Avon would place orders with Fareva, which Fareva stated they could deliver on but that Fareva would later fail to deliver on time and in full. Tr. 772-73, 791-92.

6. Ms. Sosa testified that as a result of Avon's inability to rely on Fareva to deliver as promised, Avon often would not be able to create business plans to sell the products. Tr. 773-74.

7. Ms. Sosa testified that this strategy of waiting for delivery resulted in excess inventory sitting for longer in Avon and Fareva's warehouses, inventory without a business plan to sell the products. Tr. 774-76, 800. Ms. Sosa testified that it would take Avon several weeks

after delivery for Avon to create a business plan to sell the products. Tr. 776. Ms. Sosa testified that certain products sat as excess inventory for longer than others if the delays caused Avon to miss a seasonal selling window. Tr. 776.

8. Mr. Bosson testified that because of Fareva's breach, Avon was often out of stock of many of its best-selling products. Tr. 136-37. Mr. Bosson testified that he received and reviewed feedback from Sales Representatives complaining about products being out of stock for long periods of time. Tr. 139-40, 145-46, 149-50. Mr. Bosson testified that he believed that Fareva's failure to produce these products and their resulting shortages damaged Avon's relationship with its Sales Representatives and caused an increase in attrition. Tr. 138, 166, 244.

9. Ms. Sosa testified that Avon's Sales Representatives knew about Fareva's changing and inconsistent information, damaging Avon's relationships with its Sales Representatives. Tr. 777-79.

10. Mr. Bosson further testified that he believed Avon lost a large quantity of sales due to Fareva's failure to deliver orders and breach of the MSA. Tr. 108, 138, 140-41. Many of Avon's bestselling products were out of stock for long periods of time, which resulted in lost sales of those products and many customers abandoned orders if the core product was out of stock. Tr. 140-41, 165-66. Mr. Bosson testified that it would be difficult to quantify the scale of this harm. Tr. 141, 164-66, 168.

11. Mr. Seo testified that in response to Fareva's breach Avon began selling LG products to replace some of the products that Fareva failed to produce. Tr. 619-20. He estimated Avon sold about $45 million per year of LG products from 2020 to 2023. Tr. 620, 622.

12. Mr. Seo testified that Avon implemented strategies to attempt to retain Sales Representatives as one of its core business strategies for Avon under LG. Tr. 623, 625. Mr. Seo

testified that such retention programs were particularly important because of the harm to Avon's relationship with its Sales Representatives. Tr. 626-27.

13. Following Fareva's termination of the MSA, Avon also suffered harm as it was forced to quickly find new suppliers for its products. Ms. Sosa testified that Avon had to undergo a time-consuming and laborious process to find new suppliers. Avon had produced about 350 products at the Morton Grove Facility. Avon was able to find new suppliers for about 195 of those products, and for the remaining products Avon could not find a new supplier that was cost effective or able to produce Avon's specific formulations. Ms. Sosa testified that the new suppliers were typically about two to four times more expensive than Fareva.

14. Avon effected the transition to new suppliers in phases, with the first phase taking until 2025 to complete. The first phase focused on finding new suppliers at prices Avon could afford. The second phase, which is currently ongoing, reexamines those manufacturing relationships to improve efficiency in Avon's new supply chains.

**B. Lost Profit Analysis.**

1. Avon's expert, Brent Bersin, testified that he estimated that Avon suffered $223,364,587 in lost profit damages from 2020 to 2028, or from the start of Fareva's service failures through the end of the MSA's term. Tr. 1144, 1169. This figure includes $54,581,724 of estimated lost profits from 2020 to 2022, the period in which NSLPs accumulated. Tr. 1165, 1169.

2. To make his calculations, Mr. Bersin used a "yardstick" analysis, which compared Avon's performance to that of the beauty and personal care industry as defined by a Statista data set. Tr. 1153-54. The data set Mr. Bersin used showed that the industry grew year-over-year, with the exception of a contraction in 2020. Tr. 1155, 1157-59. Thus, Mr. Bersin's analysis assumed that, absent Fareva's breach, Avon would have grown at a similar rate each year. Tr. 1160-61.

3. Mr. Bersin justified his use of this growing market as a comparison, despite Avon's overall declining sales, because the data he relied on showed that the net sales of products from Morton Grove were increasing year-over-year from 2017 to 2019. Tr. 1149, 1151-53. However, Fareva's counsel showed that there were gaps in Mr. Bersin's data set, compared to a list of products made at Morton Grove provided by fact witnesses Ms. Sosa and Ms. Kelly, which makes Mr. Bersin's data infirm. Tr. 1207-08, 1211, 1213-14.

4. While the beauty and personal care market does sell the same products as Avon, the comparison ends there. Tr. 1156-57, 1258-64. Avon's business had a different trend from this market prior to Fareva's breach. Tr. 1155, 1159; DDX-A; DDX-B. Namely, Avon had suffered consistently declining sales while the comparison market grew. Further, the companies used by Mr. Bersin as comparators sold high-end and luxury brands in retail locations, as well as online, thus limiting the value of the comparison. Tr. 1258, 1261-62.

5. Further, the basis of comparison between the Statista data and Avon is limited, as the Statista data began in 2019, giving Mr. Bersin only one year of real data overlap to compare before Fareva's breach.

6. Christopher Brophy, Fareva's rebuttal expert, noted these infirmities in Mr. Bersin's analysis, among others. Tr. 1305-06, 1310-13, 1319-22.

7. Therefore, I find that Mr. Bersin's testimony is of limited value, as it overstates Avon's lost profit damages for the relevant time period.

### C. Avon's Volume Commitment.

1. As defined above, Avon was obligated to meet its 86-million-unit Volume Commitment each year, else it would owe a penalty to Fareva.

2. Avon internally tracked its ability to meet the Volume Commitment and had

forecasted shortfalls when comparing its business plan to the Volume Commitment of approximately 20 to 30 million units for 2021. DX-CF, PX 227; Tr. 832-33.

3. While some of Avon's witnesses, including Ms. Sosa and Mr. Seo, testified that Avon did not order more products than Avon needed, documentary evidence and testimony from Paul Cali showed that Avon ordered units beyond its needs in order to meet its Volume Commitment. DX-BJ; Tr. 862-63, 866-68.

4. Avon had experienced consistently declining sales and faced a Volume Commitment set higher than for which Avon had actual demand or could support with sales. Thus, Avon placed large orders of low-price items in order to meet its Volume Commitment and minimize the penalty.

5. This was illustrated through Avon's orders for roll-on deodorant products, which account for a large portion of Avon's claimed NSLP damages.

6. Roll-on deodorants are a product that Avon sells in bulk to a smaller number of wholesalers, rather than to a large number of individual Sales Representatives. Tr. 112-13, 701, 781. Avon referred to the roll-on deodorant wholesalers as 1900 Accounts. Tr. 112, 781. The 1900 Accounts would purchase millions of roll-on deodorant units each year, placing orders for several million units at a time. Tr. 702, 781, 800, 834. Avon's bestselling scents of the roll-on deodorant products were Black Suede and Wild Country. Tr. 894-95.

7. Ms. Sosa and Mr. Seo both testified that because of the scale these products operated on, it was typical for Avon to maintain inventories of millions of product units and that Avon would consider having fewer than several million units in inventory to be insufficient to support business planning for roll-on deodorants. Tr. 701-02, 800-01, 881, 894-95.

8. In April 2021, Ms. Sosa testified, she was asked to plan to have Fareva produce 35

million units of roll-on deodorant products in 2021. Tr. 781-82. Ms. Sosa testified that she discussed this request with Fareva and collaboratively with Fareva came up with a plan for Fareva to produce those units. Tr. 782, 786-91. Ms. Sosa testified that Avon was to place the orders for the 35 million units spread across the remaining calendar year. Tr. 791, 798.

9. In April 2021, Avon had approximately 4 million units of roll-on deodorants in inventory at the Morton Grove Facility. DDX-G. By November 2021, Avon had approximately 7 million units of roll-on deodorant in inventory at the Morton Grove Facility. DDX-G.

10. In August 2021, Ms. Sosa testified, Fareva had failed to deliver as planned on its production of the roll-on deodorant units. Tr. 792, 796-97. Because of Fareva's repeated failures to deliver and Ms. Sosa's lack of faith in their ability to fulfill future orders, Ms. Sosa testified that she stopped placing the roll-on deodorant orders according to the 35-million-unit plan. Tr. 797-98. Ms. Sosa testified that she believed that placing those orders would cause internal issues because the undelivered and late status of so many product units combined with additional orders each week caused "chaos" for her team. Tr. 797, 799.

11. However, in November 2021, Ms. Sosa was directed by Dongseok Kang, previously Head of R&D, Procurement, and Global Supply Chain at LG H&H, to place the balance of the 35-million-unit order, which was 31 million units (the "November ROD Order"). Tr. 798, 862-63; DX-BJ.

12. Email chains between Mr. Kang, Mr. Cali, and others included discussions about placing the 31 million roll-on deodorant order to meet the Volume Commitment. The email from Mr. Kang stated that "we have no choice but to load the units in the system to fulfill our commitment" and discussed how to place the order in accordance with the MSA. DX-BJ. Mr. Kang noted in the email that Avon had been working on the large roll-on deodorant order with

Fareva since the summer, but Fareva failed to process the orders, requiring Avon to push out the delivery on those orders. DX-BJ.

13. In the email chain, Mr. Cali expressed concern with Avon's "approach to just add ROD's [roll-on deodorants] and lip balms" to address Volume Commitment because Avon was "not shipping ROD's out and will created [sic] excess inventory with no place to store." DX-BJ.

14. In another email chain, Mr. Kang wrote that Avon had, according to its systems, 1.5 years' worth of inventory on hand for roll-on deodorants, and in the chain LG's CEO Suk Cha asked why Avon was "stocking excessive RODs." PX 375.

15. Mr. Kang testified that, while he would not agree that Avon placed the November ROD Order to avoid the Volume Commitment penalty, that Avon placed the order "so [that Avon was] doing [its] part of [Volume] commitments so that [Avon] would meet the MSA requirements" and that "if [Avon] ha[d] not placed any … [Avon] would not have any grounds to negotiate with Fareva in terms of the annual payments." Tr. 984. However, Mr. Kang maintained that there was 1900 Account demand for the products. Tr. 985.

16. Additionally, in Mr. Cali's deposition testimony, he repeatedly acknowledged that the November ROD Order was placed, at least in part, to meet the Volume Commitment, not because of customer demand. Tr. 1378, 1381, 1384.

17. The weight of this evidence shows that while Avon may have planned since April 2021 to order 35 million units, its decision to place the bulk of that order in November 2021 was driven by the desire to meet the Volume Commitment, not based on demand for the product.

## CONCLUSIONS OF LAW

### I. LEGAL STANDARD

1. I previously held that N.Y. U.C.C. Law § 2-718(1) and *Equitable Lumber* supply the legal standard to determine whether Avon's claimed liquidated damages are penalties. ECF No. 211.

2. In *Equitable Lumber*, the New York Court of Appeals held that N.Y. U.C.C. Law § 2-718(1) sets forth the test for whether a liquidated damages provision is enforceable. *See Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 344 N.E.2d 391, 395-96 (N.Y. 1976). *Equitable Lumber* involved a dispute over a contract fixing the amount of attorney's fees at 30% of the amount recovered. *Id.* at 393.

3. Under N.Y. U.C.C. Law § 2-718(1) and *Equitable Lumber*, a liquidated damages provision imposes an unenforceable penalty if it fixes an amount that does not bear a "reasonable proportion" to (1) "the harm which the parties anticipate will result from the breach at the time of contracting," or (2) "the actual damages suffered by the nondefaulting party at the time of breach." *Equitable Lumber*, 344 N.E.2d at 395-96.

4. Even if a liquidated damages provision satisfies the test stated above, a liquidated damages clause can be unenforceable "if it is so unreasonably large that it serves as a penalty rather than a good faith attempt to pre-estimate damages." *Equitable Lumber*, 344 N.E.2d at 395.

5. While the test under New York law is clear, "it has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation." 3 Farnsworth, Contracts § 12.18, at 303–304 (3d ed.).

6. New York courts have held that "a liquidated damages provision grossly disproportionate to the amount of actual damages" is a "countervailing public policy" that can override the general presumption that "freedom of contract prevails in an arm's length transaction between sophisticated parties." *Trs. of Columbia Univ. v. D'Agostino Supermarkets, Inc.*, 162 N.E.3d 727, 731 n.4 (N.Y. 2020).

7. However, the New York Court of Appeals has also "cautioned generally against interfering with parties' agreements ... [a]bsent some element of fraud, exploitive overreaching or unconscionable conduct." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380, 828 N.E.2d 604, 609 (2005).

8. Further, "New York courts also give due consideration to whether the parties were sophisticated and represented by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and that the provision was freely contracted to." *Brands Within Reach, LLC v. Belvoir Fruit Farms Ltd.*, No. 19-CV-4947 (AEK), 2022 WL 4585445, at *6 (S.D.N.Y. Sept. 29, 2022).

9. In *XCO Int'l Inc. v. Pac. Sci.*, a decision cited favorably by the New York Court of Appeals in *JMD Holding*, Judge Posner considered a liquidated damages provision related to a patent violation. *XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1002 (7th Cir. 2004).

10. In his opinion, Judge Posner discussed the "mysterious" reasons for the policy against penalty clauses, noting that "the rule against penalty clauses, though it lingers, has come to seem rather an anachronism, especially in cases in which commercial enterprises are on both sides of the contract." *XCO Int'l Inc.*, 369 F.3d at 1002.

11. In such cases with sophisticated parties, "it is easy to assign nonexploitive reasons for contractual penalties and hard to give convincing reasons why in the absence of fraud or

unconscionability consenting adults that are, moreover, substantial organizations rather than mere consumers should be prohibited from agreeing to such provisions." *Id.* at 1002 (quoting *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*, 258 F.3d 645, 655 (7th Cir. 2001)).

12. Thus, Judge Posner concluded in *XCO Int'l Inc.* that the liquidated damages provision at issue, which had been negotiated by sophisticated parties, was not a penalty and was enforceable. *Id.* at 1004-05.

## II. DISCUSSION

### A. Avon's claimed $20 million Early Termination Fee is enforceable.

13. The Early Termination Fee is a reasonable estimate of the harm the parties anticipated would result from breach at the time of contracting. Indeed, the Early Termination Fee recognizes the discounted price of Avon's sale of the Morton Grove Facility to Fareva, in exchange for the provisions of the MSA, including discounts totaling $40,333,333 to be applied to the purchase of products by Avon from Fareva.

14. The parties planned that the MSA would last at least ten years. Accordingly, the purpose of the Early Termination Fee was to reimburse Avon for the discounted factory sale price it gave Fareva, for each year in which it did not receive its benefit of the bargain, in essence pro-rating Fareva's purchase price through the MSA.

15. Avon sold the Morton Grove Facility to Fareva for a significant discount below its market value, and thus, at the time of contracting, the parties understood that if Fareva were to terminate the MSA prematurely, Avon would lose the benefit of the MSA's conversion cost discount, a value estimated at $4 million for each year remaining in the contract term with $333,333 pro-rated for 2018.

16. Avon's witnesses involved in the transaction, Mr. Klein and Mr. Bosson, testified to these facts and the documents in evidence support their testimony, including the parties' December 2017 Letter of Intent.

17. Fareva offered scant evidence to undermine the facts of these core components of the MSA and failed to rebut Avon's witnesses' testimony as to the purposes of the Early Termination Fee and pricing of the sale of Morton Grove.

18. Fareva relies on the language in Section 13.3(b) of the MSA to argue that the value of the $4 million per year discount payments was related to the Volume Commitment, not purchase price. However, Fareva elicited no witness testimony to confirm this interpretation and made this point only through attorney argument. As such, it is insufficient in the face of the overwhelming evidence presented by Avon about the purposes of the Early Termination Fee.

19. I hold that the Early Termination Fee bore a reasonable, if not exact, relationship to anticipated harm to Avon upon Fareva's breach and that it is not so unreasonably large that it constitutes an unlawful penalty. Fareva has not met its burden of proof that the Early Termination Fee is an unlawful penalty.

20. Therefore, Avon's claimed $20 million Early Termination Fee is enforceable under New York law.

**B. The In Full Credit is reformed due to scrivener's error.**

21. When Avon decided to sell the Morton Grove Facility, it sought a buyer with whom it could establish a long-term manufacturing relationship that maintained high levels of service. Avon knew it would suffer harm from lower service levels, given its business structure and historical operations. Indeed, Avon suffered actual harm as a result of Fareva's failure to provide adequate service, though such damages are difficult to determine.

22. Thus, Avon sought to include terms in the MSA that would create both the long-term relationship and provide protection against low service levels, and communicated these needs to Fareva.

23. Schedule D was the subject of extensive negotiations between the parties, lasting from January through November 2018. The parties exchanged multiple proposals and iterations of how to structure the NSLPs, including multiple drafts exchanged between counsel.

24. The parties reached a final agreement on the substance of Schedule D in October 2018, as written in Mr. Petras's email to Ms. Marcus on October 1, 2018. PX 139. This agreement included each of the key aspects of Schedule D and, importantly, reflected the parties' intent that the In Full Credit be calculated on a one-time basis, not as a weekly repeating charge.

25. Mr. Petras testified that a non-repeating In Full Credit was what the parties intended Schedule D to contain and what they had verbally agreed to. He testified that he was shocked to see the formula applied with a repeat charge when he first became aware of Avon's interpretation in 2021. Mr. Petras testified that he did not agree to a repeating In Full Credit.

26. After Mr. Petras and Ms. Marcus completed negotiating the terms of Schedule D, the parties' attorneys began drafting the agreement in October and November 2018. The parties exchanged multiple drafts, and in one of those drafts, tucked into the definition of the term "Missed Products" the meaning of the In Full Credit changed from a one-time charge to a repeating charge.

27. While Avon notes that Fareva's attorney edited the Missed Products definition, in an apparent attempt to change the meaning of the term to reflect a one-time charge, Avon did not provide any evidence or witness testimony that contradicts Mr. Petras, and the evidence in the record supports that the parties mutually agreed to a one-time charge for the In Full Credit.

28. As such, I hold that the evidence shows that Avon and Fareva had agreed to a non-

repeating In Full Credit but that attorney drafting error changed the meaning of the term in the enacted MSA.

29. Under New York law, I may "equitably reform" a contract that contains a scrivener's error. *Washington v. NYC Medical Practice, P.C.*, No. 18-CV-9052 (PAC), 2021 WL 918753, at *5 (S.D.N.Y. Mar. 10, 2021) ("In contract law, a scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error; this permits a court acting in equity to reform an agreement. Where there is no mistake about the agreement and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.") (internal quotation marks and citations omitted).

30. The reformation of a contract is an equitable remedy. *Id.* Its purpose is to save a contract when there is disparity between the parties' agreement and the drafter. The use of reformation in response to a motion is a task for the court and not the jury.

31. Here, the drafting error by the parties' attorneys reflects a scrivener's error that I may equitably reform to enact the parties' intent of a one-time charge for the In Full Credit.

32. Therefore, in the definition for "In Full Service Ratio Threshold" I strike the phrase "plus all Missed Products" to thereby remove the repeating element and conform with the parties' intent. The definition shall read as follows:

> "In Full Service Ratio Threshold" means (i) the number of units of Products included in Orders with a Delivery Date in a particular week (excluding any NORs, multiplied by (ii) ninety-five percent (95%)).
>
> MSA Sched. D.

33. Additionally, the In Full Credit formula in Schedule D Section 2(b) is modified to

remove the reference to "Corrected Products". The formula shall read as follows:

(In Full Service Ratio Threshold - number of units of Product On Time)

x

Average Adjusted Conversion Cost Per Unit

x

0.75

MSA Sched. D.

34. Avon points to Mr. Mousset's edits to the Missed Product definition in a draft version of the MSA that attempted to remove the repetitive nature of the In Full Credit, and later acceptance of the definition with the repetition, as evidence that Fareva agreed to the repetition. Tr. 599-600; PX 166. However, implementation of Mr. Mousset's edit to the Missed Product definition alone would lead to a break-down in the formulas and not properly reflect the parties' intent of non-repetition.

35. On October 5, 2026, at approximately 4 p.m., I sent the parties a proposed draft of these findings. On October 7, 2026, the parties presented oral argument on the substance of the findings, at which Avon argued that they lacked sufficient notice of the scrivener's error issue and were thus unable to present a case against it at trial.

36. I invited Avon to present such evidence at the argument on October 7, 2026, by an offer of proof. Avon's knowledge of the case is such that between the time I provided the draft and the argument on October 7, they had sufficient time to gather relevant evidence. The failure of Avon to make an offer of proof indicates that the result would not change with added evidence.

### C. Schedule D is enforceable as reformed.

37. As redrafted above, Schedule D is enforceable.

38. The MSA is a highly complicated contract, spanning over a hundred pages and

including numerous schedules, defined terms, and formulas. The complicated and verbose nature of the MSA makes interpretation difficult, especially in regard to Schedule D and the formulas therein.

39. Schedule D is ambiguous in defining the In Full Credit portion of the "On Time and In Full" requirements for fulfilling orders. Schedule D provides different formulas for each component and provides that the higher calculation should affect the amount to be charged weekly. MSA Schedule D § 2(c). In practice, this caused Avon to re-order product units that were undelivered, and Avon's expert, Mr. Campanelli, relied on those re-issued orders to calculate the In Full Credit. Avon argues for repetitive counting of failures to produce and deliver in full. Late deliveries of orders also call for repetitive charges. These multiple countings potentially create penalties. In order to save the Schedule D credits from being deemed penalties, it requires reformation so that there can be clear division between a late delivery and failure to make delivery.

40. At the stage of negotiations, the In Full and On Time Credits, as reformed to reflect the parties' actual intent, were a reasonable approximation of damages Avon would suffer from Fareva's non-performance. The In Full Credit sought to estimate the harm Avon would suffer from product delays by using a fraction of the average conversion cost of the products made at Morton Grove. Grounding the In Full Credit in the conversion cost was not an unreasonable estimation of actual harm. Depending on the product, Avon's harm could be much greater from cascading effects of lost sales on bundles of products, lost Sales Representatives, and other effects. Thus, the use of a fractional average conversion cost was not unreasonable as an estimate of harm.

41. Similarly, the On Time Credit was negotiated by the parties based on Avon's internal estimates of its harm from delays on each order, as testified to by Mr. Klein. Mr. Klein believed that, based on this modeling and prior experiences from Avon's ownership of Morton

Grove, the harm to Avon would be closer to $1,000 but that the parties negotiated the figure to $500 per late order. Given the complexity of Avon's harm and the potential for lost profits and other effects on the number of items in a single order, the OT Credit was not an unreasonable estimation of harm at the time of contracting.

42. Further, when negotiating these terms, the parties involved were sophisticated and represented by counsel. The parties had their own motivations and reached final agreements on the MSA's terms through compromise and after extensive negotiations.

43. The record also shows that Avon's harm from Fareva's breach was difficult to quantify, thus favoring the use of liquidated damages. Avon has established that the harms it suffered were numerous, spread out across its business, and difficult to quantify. Avon experienced lost sales from late products and lost sales from bundled products, lost trust with its customers and Sales Representatives, difficulties in business planning that led to longer inventory times, transition costs from finding new suppliers after Fareva's breach, higher manufacturing costs, and more.

44. The scope of these harms is difficult to estimate, even taking into consideration Avon's declining sales year-to-year.

45. Throughout the negotiations, the parties referred to the NSLPs as a bonus and penalty structure. The use of the term "penalty" was abandoned when Avon's attorneys began drafting Schedule D for the MSA. However, the use of such terminology is not conclusive. *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 375 (S.D.N.Y. 2019) ("In analyzing whether a damages provision is a penalty, 'it is not material [what] the parties themselves have chosen to call the provision'—courts look to 'substance' and not to 'form' to determine whether the provision is a valid liquidated damages clause or an unenforceable penalty.") (quoting *Truck Rent-A-Ctr.*,

*Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977)).

46. The $152 million amount Avon seeks under the NSLPs does not bear a reasonable proportion to actual harm and would be an unenforceable penalty if awarded.

47. At the time of contracting, the parties did not anticipate Schedule D resulting in a damages figure this high. The amount is greater than the cash sale price LG paid to acquire Avon ($125 million) and the amount paid to Fareva for the products at issue ($98.1 million from May 2020 to December 2022).

48. The contrary testimony provided by Avon's expert Brent Bersin that Avon's lost profit damages actually amounted to approximately $223 million is a gross overestimation of Avon's actual harm.

49. There were no NSLP damages in the first contract year. But in following years, NSLP damages skyrocketed, because of Fareva's exceedingly low levels of service (frequently delivering less than 25% of orders on time and in full) and because of Avon's ordering excessive quantities of products for which it had no demand.

50. The key example of Avon's over-ordering is the roll-on deodorants. The November 2021 Order of roll-on deodorants accounts for a large portion of Avon's NSLP claims despite the evidence showing that Avon ordered the bulk of the roll-on deodorants to meet its Volume Commitment, not to meet actual demand for the product and that Avon already had a large inventory of these products. This example illustrates how the damages accrued through NSLPs were not reasonably tied to the actual harm Avon experienced from the delays in producing those items.

51. However, as reformed to match the parties' intent, Schedule D yields a result of approximately $14.5 million—though, this figure is based on the representation of Fareva's

counsel, and the actual amount is a question of fact for the jury.

52. Using the $14.5 million figure as an approximate baseline, the result is reasonable. For all the reasons that $152 million is unreasonable $14.5 million is not; nor is it unreasonably large as to constitute a penalty. The liquidated damages are appropriate because determining Avon's actual damages is not possible.

53. This holding also respects the parties' freedom to contract and upholds an agreement reached by two sophisticated parties following months of intensive negotiations. As reformed, Schedule D does not offend public policy and should be upheld.

54. Therefore, I hold that Schedule D is enforceable as reformed to reflect the parties' true intentions at the time of contracting.

## CONCLUSION

Therefore, I hold: (1) the Early Termination Fee is an enforceable liquidated damages clause, under which Avon is entitled to $20 million in damages; (2) the In Full Credit under Schedule D is reformed to reflect the parties' intention of a one-time charge; and (3) Schedule D, as reformed, is an enforceable liquidated damages clause, under which Avon is entitled to damages in an amount to be determined by jury trial.

A conference will be held in Courtroom 14D on November 18, 2026, at 11 a.m. to regulate further proceedings. Counsel will provide a joint agenda one day before the conference.

SO ORDERED.

Dated: October 13, 2026
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge